# IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF GEORGIA
### ATLANTA DIVISION

| | | |
|---|---|---|
| **DAN BENSON,** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | **CIVIL ACTION FILE** |
| **v.** | § | **1:13-CV-0595-WSD** |
| | § | |
| **ANDRES FACEMYER,** | § | |
| | § | |
| **Defendant.** | § | |

## DEFENDANT FACEMYER'S MOTION *IN LIMINE*

COMES NOW, Andres Facemyer, Defendant, pursuant to Federal Rules of Evidence 401, 403, and 404(b), makes and files this Motion *In Limine* to limit argument and evidence concerning the following:

1. The Preliminary hearing held on March 9, 2011;

2. The search of Plaintiff's vehicle or any other investigative search and the outcome of the investigation;

3. Child pornography or the absence of items that can be categorized as such;

4. Plaintiff possessing a valid permit to carry a concealed weapon; and

5. Miranda warnings prior to questioning.

In support of this motion, Defendant Facemyer relies upon the attached

1

Memorandum in support.

Respectfully submitted this 9th day of January, 2015.

/s/ *Veronica L. Hoffler*
**ROBERT N. GODFREY**
Chief Counsel
Georgia Bar No.  298550
**TAMARA N. BAINES**
Sr. Assistant City Attorney
Georgia Bar No. 032460
**LASHAWN W. TERRY**
Sr. Assistant City Attorney
Georgia Bar No. 702578
**VERONICA L. HOFFLER**
Assistant City Attorney
Georgia Bar No. 358799


*Attorneys for Defendant Facemyer*


City of Atlanta Law Department
55 Trinity Avenue
Suite 5000
Atlanta, GA 30303
(404) 546-4148 (telephone)
(404) 739-3340 (facsimile)
vlhoffler@atlantaga.gov

2

# IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF GEORGIA
### ATLANTA DIVISION

| | | |
|---|---|---|
| **DAN BENSON,** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | **CIVIL ACTION FILE** |
| **v.** | § | **1:13-CV-0595-WSD** |
| | § | |
| **ANDRES FACEMYER,** | § | |
| | § | |
| **Defendant.** | § | |

## CERTIFICATE OF SERVICE

I hereby certify that on January 9, 2015, I electronically filed the foregoing **DEFENDANT FACEMYER'S MOTION *IN LIMINE*** with the Clerk of Court using the CM/ECF system, which will automatically send e-mail notification to the following attorneys of record:

Jeffrey R. Filipovits
Filipovits Law Firm, P.C.
2900 Chamblee-Tucker Road
Building 1
Atlanta, GA 30341


*/S/ VERONICA L. HOFFLER*
**VERONICA L. HOFFLER**
Assistant City Attorney
Georgia Bar No. 032460

***Attorney for Defendant Facemyer***

3

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | | |
|---|---|---|
| DAN BENSON, | § | |
| | § | |
| Plaintiff, | § | |
| | § | CIVIL ACTION FILE |
| v. | § | 1:13-CV-0595-WSD |
| | § | |
| ANDRES FACEMYER, | § | |
| | § | |
| Defendant. | § | |

## MEMORANDUM IN SUPPORT OF
## DEFENDANT FACEMYER'S MOTION *IN LIMINE*

COMES NOW, Andres Facemyer, Defendant, and files this Brief in Support of Defendant Facemyer's Motion *In Limine* and shows the Court as follows:

### I.   STATEMENT OF THE CASE

This is an action filed by Plaintiff Dan Benson ("Plaintiff") against Officer Andres Facemyer ("Defendant Facemyer"), individually, alleging a violation of 42 U.S.C. § 1983.  Plaintiff's case surrounds his arrest on February 22, 2011 and his contention that he was arrested without probable cause.  This case highlights the critical distinction the law makes between the arguable probable cause standard for qualified immunity (and probable cause standard for an arrest) on the one hand and the more rigorous standard imposed under criminal law for a conviction on the other.

4

## II.   <u>STATEMENT OF FACTS</u>

Plaintiff, who lives in Stone Mountain, claims that on February 22, 2011, he traveled to Chastain Park to walk along the park trail.[1]  As he was walking, he passed a woman, Amy Wood, who was walking with her two and half year old daughter closely alongside of her.[2]  As Ms. Woods and her daughter passed, Plaintiff claims that he waived hello and, although the child did not initially respond, the mother instructed her to say hello.  It was at that point that Plaintiff contends that the child raised her dress and revealed her panties and Plaintiff responded "oh, do your panties match your dress?"

While Plaintiff claims that was the extent of his interaction with Ms. Wood and her minor child, Ms. Woods had a different perspective.  Ms. Wood reported this encounter to the Atlanta Police Department as Plaintiff being the aggressor in asking the child about her panties.[3]  Specifically, according to Ms. Wood, she and her daughter encountered Plaintiff as he sat on a park swing near the water fountain and when Plaintiff initially said "hi," she kept walking and did not respond because she didn't feel comfortable.[4]  Ms. Wood said later that day on the other side of the park,

---

[1] Complaint, ¶¶6,8,9.
[2] *Id.* at ¶9.
[3] *Id.* at ¶18.
[4] Declaration of Facemyer; Amy Wood Statement and Incident Report.

she again saw Plaintiff, who "ended up" on a swing across from her and her daughter.[5]

It was at that time that Plaintiff approached Ms. Wood and her daughter and again said

"hi" to which the minor child responded.[6]  Plaintiff told the child that her dress was

pretty and, after the child responded that it was pink, Plaintiff responded by asking the

two and a half year old girl if "her panties were pretty and matched her dress."[7]  Ms.

Wood stated that Plaintiff made her very uncomfortable so she "picked up [her]

daughter and carried her toward [their] parked car" and then "stopped a woman

(Royce Horn) walking to use her phone to call 911."[8]

After interviewing the parties and having Ms. Wood positively identify the

plaintiff as the man she had encountered, Officer Facemyer arrested Plaintiff and

charged him with child molestation.[9]  Plaintiff was also charged with possession of a

firearm during the commission of a felony as he was armed with a loaded Ruger .380

pistol at the time of his arrest.[10]  Plaintiff was later indicted by a grand jury and

voluntarily entered into a pretrial diversion program to avoid trial.[11]

---

[5] *Id.*
[6] *Id.*
[7] *Id.*
[8] Declaration of Facemyer; Amy Wood Statement
[9] *Id.*
[10] Declaration of Facemyer; Amy Wood Statement; Complaint ¶¶ 21, 26.
[11] Complaint ¶¶35-36.

### III.   ARGUMENT AND CITATION

**A. Plaintiff Should Be Barred From Mentioning, Arguing Or Introducing Any Evidence Related To The Preliminary Hearing.**

Plaintiff should be barred from mentioning, arguing or introducing any evidence related to the preliminary hearing held on March 9, 2011 as the testimony is more prejudicial than probative and will only confuse the jury.  When determining whether to admit evidence, the trial judge must balance the relevance of the evidence against the potential harm that may be caused by admitting the evidence.  *Fed. R. Evid. 403* states that while the evidence may be relevant, "evidence may be excluded if its probative value is outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury…"[12].

Here, Plaintiff has expressed intent to introduce evidence related to the preliminary hearing on March 9, 2011 to support his contention that Plaintiff was falsely arrested.[13]  Plaintiff seeks to introduce this evidence while simultaneously seeking to exclude the Grand Juries' subsequent indictment of Plaintiff on the *same*

---

[12] Fed.R.Evid. 403; *see also*, *Chavis v. Clayton County Sch. Dist.*, 2005 WL 2114146 (11th Cir. September 2, 2005); *Schafer v. Time, Inc.,* 142 F.3d 1361 (11th Cir. 1998).
[13] During the preliminary hearing, the judge found that probable cause did not exist and dismissed the charges against Plaintiff.  *See* Exhibit A - Transcript of Preliminary Hearing Heard Before the Honorable Karen Woodson, Judge, Atlanta Judicial Circuit, Commencing on March 9, 2011.

charges and Plaintiff's plea bargain.[14]   However, neither the contents of this hearing

nor its outcome have any bearing on whether or not Officer Facemyer had arguable

probable cause to arrest Plaintiff.   Consequently, this evidence will only serve to

mislead the jury into believing that, merely because the charges were initially

dismissed against Plaintiff, Plaintiff was innocent when Plaintiff's innocence or guilt

is not at issue in this case.   It will also serve to inflame and unduly prejudice the jury

against Defendant Facemyer.   In *Wells v. Stynchcombe*, the Georgia Supreme Court

recognized the limited relevance of a preliminary hearing.   The Wells Court noted a

preliminary hearing is limited to a determination of probable cause to believe the guilt

of the accused so as to require him to appear and answer before a court with

jurisdiction[15]. Further, a dismissal of charges based upon lack of probable cause does

not bar the subsequent indictment and trial of a defendant on the same charges.[16]

Therefore, it does not constitute a judgment in the sense that it settles the guilt or

innocence of the accused.[17]

      The standard for arguable probable cause is "whether a reasonable officer in the

same circumstances and possessing the same knowledge as the officer in question

---

[14] *See* Plaintiff's portion of the Proposed Consolidated Pre-trial Order, Doc. No. 28, Pages 34-35.
[15] 231 Ga. 199, 201 (1973).
[16] *Smith v. State,* 171 Ga.App. 279, 282, (1984).
[17] *Wells v. Stynchcombe* at 201.

*could* have reasonably believed that probable cause existed in the light of well-established law."[18] The reasonableness of a particular action must be judged from the perspective of a reasonable officer on the scene, rather than with a 20/20 vision of hindsight.[19]   The preliminary hearing transcript is particularly irrelevant and misleading, as the focus during the preliminary hearing was whether evidence existed of the offense of child *pornography* when Plaintiff was only charged with child molestation and possession of a firearm during the commission of a felony.[20]  It was based on this testimony that no evidence existed that Plaintiff committed the offense of child pornography that the charges against him, which had nothing to do with child pornography, were dismissed.[21]  Clearly, any evidence surrounding the preliminary hearing would be highly misleading and confusing to the jury, which would be unlikely to make this critical distinction.

**B.** **Plaintiff Should Be Barred from Mentioning, Arguing or Introducing Evidence Related to the search of Plaintiff's vehicle at the time of his arrest or other investigative findings that no evidence of child pornography existed on any of Plaintiff's property.**

Plaintiff should also be barred from mentioning, arguing or introducing any evidence related to the search of Plaintiff's vehicle and home for evidence of child

---

[18] *Id.*  [Emphasis added].
[19] *Graham v. Conner*, 490 U.S. 386, 396 (1989).
[20] *See supra,* Exhibit A.
[21] *Id.*

pornography or any illicit material as it is completely irrelevant. Defendant Facemyer believes that, just as was introduced during the Preliminary Hearing, Plaintiff also intends to introduce evidence that no evidence of child pornography was found during the police search of his vehicle. Similarly, Plaintiff may seek to introduce evidence that an investigator Plaintiff hired to search his home almost two weeks after his arrest found no illicit materials. However, such testimony is not only highly irrelevant as Plaintiff was never charged with child pornography, but has no bearing on whether Officer Facemyer had arguable probable cause or probable cause at the time of Plaintiff's arrest. As such, this evidence should be excluded as it will be unfairly prejudicial to Defendant Facemyer, highly misleading and will only serve to confuse the jury.

### C. **Plaintiff Should Be Barred from Mentioning, Arguing or Introducing Evidence Related to Child Pornography.**

Plaintiff should be barred from mentioning, arguing or introducing any evidence related to child pornography as he was not charged with that offense. Plaintiff was charged with child molestation which is defined as "any immoral or indecent act to or in the presence of or with any child under the age of 16 years with the intent to arouse or satisfy the sexual desires of either the child or the person."[22] There is no requirement that the person also be in possession of child pornography;

10

therefore, any mention of child pornography would be irrelevant and only serve to inflame, mislead and confuse the jury.

**D. <u>Plaintiff Should Be Barred from Mentioning, Arguing or Introducing Evidence Related to Plaintiff's Possession of a Valid Permit to Carry a Concealed Weapon.</u>**

Plaintiff should be barred from mentioning, arguing or introducing evidence related to Plaintiff's possession of a valid permit to carry a concealed weapon as such evidence is irrelevant and will only serve to confuse the jury.  Plaintiff was not charged with carrying a concealed weapon without a permit.  Rather, Plaintiff was charged with the possession of a firearm during the commission of a felony in violation of O.C.G.A. §16-11-106.  The offense of possession of firearm during the commission of a felony is completed without regard to the existence of a valid weapon's permit.[23]

**E. <u>Plaintiffs Should Be Barred from Mentioning, Arguing or Introducing Evidence That He Was Not Mirandized Prior to Being Questioned.</u>**

This court should bar Plaintiff from mentioning, arguing or introducing evidence that he was not read his Miranda[24] rights prior to being questioned. Specifically, Plaintiff may contend that after his arrest, he was not read his rights by

---

[22] O.C.G.A. §16-6-4
[23] *Spence v. State*, 233 GA 527 (1975).
[24] *Miranda v. Arizona,* 384 U.S. 436 (1966).

Officer Facemyer and other officers prior to being questioned about his actions on the date of his arrest.  However, this testimony is highly irrelevant as whether Plaintiff was properly Mirandized is only relevant to the *criminal* action against him, not the *civil* action against Officer Facemyer.  Such evidence is particularly irrelevant since Miranda violations fall under the purview of the <u>Fifth Amendment</u> of the United States Constitution and Plaintiff has only brought a <u>Fourth Amendment</u> claim against Officer Facemyer.  To allow this irrelevant evidence to be introduced would be highly confusing and misleading to the jury.  As such, it should be excluded.

### IV.   <u>CONCLUSION</u>

For the reasons set forth herein, Defendant Facemyer requests that the Motion *In Limine* be granted.

Respectfully submitted this 9th day of January, 2015.

<u>/s/ *Veronica L. Hoffler*</u>
**ROBERT N. GODFREY**
Chief Counsel
Georgia Bar No.  298550
**TAMARA N. BAINES**
Sr. Assistant City Attorney
Georgia Bar No. 032460
**LASHAWN W. TERRY**
Sr. Assistant City Attorney
Georgia Bar No. 702578
**VERONICA L. HOFFLER**
Assistant City Attorney
Georgia Bar No. 358799

*Attorneys for Defendant Facemyer*

City of Atlanta Law Department
55 Trinity Avenue
Suite 5000
Atlanta, GA 30303
(404) 546-4148 (telephone)
(404) 739-3340 (facsimile)
vlhoffler@atlantaga.gov

1

          IN THE SUPERIOR COURT OF FULTON COUNTY

2
                  STATE OF GEORGIA

3

4

5
STATE OF GEORGIA      )

6
                  )CRIMINAL ACTION

7
      VS            )FILE NO:11CP115116

8
DANNY BENSON        )

9

10

    TRANSCRIPT OF PRELIMINARY HEARING HEARD BEFORE

11
      THE HONORABLE KAREN WOODSON, JUDGE,

12
         ATLANTA JUDICIAL CIRCUIT,
        COMMENCING ON MARCH 9, 2011

13

14
A P P E A R A N C E:

15
ON BEHALF OF THE STATE:    NADI NASERI, ESQ.

16
                   ASSISTANT DISTRICT ATTORNEY

17
ON BEHALF OF DEFENDANT:    G. RUBIN, ESQ.

18
                   ATTORNEY AT LAW

19

20
        SAMANTHA ENGRAM, RPR

21
     CERTIFIED COURT REPORTER B-2429

22

23

24

25



EXHIBIT
A

1

1    POLICE OFFICER FACEMYER,

2    HAVING BEEN FIRST DULY SWORN, WAS EXAMINED AND TESTIFIED AS

3    FOLLOWS:

4    DIRECT EXAMINATION

5    BY MS. NASERI:

6    Q    OFFICER FACEMYER, CAN YOU PLEASE SPELL

7    YOUR NAME FOR THE COURT?

8    A    ANDRES, A-N-D-R-E-S. FACEMYER,

9    F-A-C-E-M-Y-E-R.

10   Q    THANK YOU. OFFICER FACEMYER. HOW ARE YOU

11   EMPLOYED?

12   A    I'M EMPLOYED AS A POLICE OFFICER WITH THE

13   CITY OF ATLANTA POLICE DEPARTMENT.

14   Q    HOW LONG HAVE YOU BEEN EMPLOYED BY THE

15   CITY OF ATLANTA POLICE DEPARTMENT?

16   A    THREE YEARS.

17   Q    ARE YOU P.O.S.T.-CERTIFIED?

18   A    YES.

19   Q    WHAT ARE YOUR PRIMARY RESPONSIBILITIES

20   WITH THE POLICE DEPARTMENT?

21   A    TO PATROL A GIVEN BEAT AND SECTOR AND

22   RESPOND TO 911 CALLS.

23   Q    WHAT IS YOUR RELATION TO THIS CASE?

24   A    I WAS THE RESPONDING AND ARRESTING

25   OFFICER.

1      Q      OKAY. THIS INCIDENT OCCURRED ON

2   FEBRUARY 22, 2011. CAN YOU TELL THE COURT WHAT

3   HAPPENED WHEN YOU RESPONDED TO THE SCENE?

4      A      I RESPONDED TO THE SCENE IN REFERENCE TO A

5   MAN SPEAKING TO A CHILD ABOUT HER UNDERGARMENTS OR

6   PANTIES. THE WITNESSES POINTED OUT THE ACCUSED,

7   MR. BENSON. HE IS SITTING BEFORE ME IN A BLUE

8   PRISON OR JAIL UNIFORM. I MADE CONTACT WITH HIM.

9   HE STATED HE WAS ARMED WITH A PISTOL. I DETAINED

10  HIM AND SECURED THE PISTOL AND MADE IT A SAFE WEAPON

11  BY REMOVING THE AMMUNITION. WE PROCEEDED WITH THE

12  INVESTIGATION OF WHAT HE WAS ACCUSED OF.

13     Q      LET'S BACK UP A MOMENT. WHERE WAS THE

14  LOCATION THAT YOU RESPONDED TO?

15     A      RESPONDED TO 135 WEST WIEUCA ROAD AT

16  CHASTAIN PARK.

17     Q      IS THAT LOCATION IN FULTON COUNTY?

18     A      YES.

19     Q      OKAY. YOU MENTIONED THAT THE DEFENDANT

20  WAS SITTING IN THE ROOM. CAN YOU PLEASE POINT HIM

21  OUT FOR THE COURT?

22     A      DIRECTLY BEHIND YOUR RIGHT SHOULDER. HE'S

23  IN A BLUE JAIL UNIFORM.

24     Q      AND THAT'S THE PERSON YOU ARRESTED ON THIS

25  DAY?

3

1          A     YES.

2                  MS. NASERI:   YOUR HONOR, MAY THE RECORD

3          REFLECT THAT THE OFFICER HAS IDENTIFIED THE

4          DEFENDANT AS THE PERSON HE ARRESTED.

5                  THE COURT:   THE RECORD WILL REFLECT.

6   BY MS. NASERI:

7          Q     WHEN YOU ARRIVED ON SCENE, DID YOU

8   INTERVIEW ANYONE?

9          A     I DID INTERVIEW THE WITNESSES.

10         Q     OKAY.  CAN YOU PLEASE TELL THE COURT WHO

11   YOU SPOKE WITH ON THAT DAY?

12         A     I SPOKE WITH THE VICTIM'S MOTHER,

13   MS. WOOD.  MS. WOOD WAS STANDING BY THE VICTIM'S

14   SIDE WHEN THE ACCUSED MADE THE STATEMENTS.

15         Q     WHAT DID MS. WOOD TELL YOU?

16         A     SHE STATED THAT MR. BENSON APPROACHED HER

17   AND HER DAUGHTER AND ASKED HER -- MADE A COMMENT TO

18   HER DAUGHTER, SAYING THAT SHE WAS WEARING A PRETTY

19   DRESS.  HER DAUGHTER IS 2 YEARS OLD, AND HER

20   DAUGHTER RESPONDED BY SAYING IT WAS A PRETTY PINK

21   DRESS.  MR. BENSON RESPONDED BY ASKING HER IF SHE

22   WAS WEARING PRETTY PINK PANTIES.

23         Q     WHAT DID THE CHILD DO AT THAT POINT?

24         A     THE CHILD LIFTED HER DRESS AND SHOWED HIM

25   THE PANTIES AND POINTED TO IT AND SAID "PRETTY

4

1    PINK."

2         Q    HOW FAR AWAY FROM THE MOTHER AND THE

3    VICTIM WAS THE DEFENDANT AT THE TIME?

4         A    THE DEFENDANT WAS NO MORE THAN 3 FEET.

5         Q    DID THE -- MS. WOOD, THE MOTHER OF THE

6    CHILD, DID SHE MAKE ANY OTHER STATEMENTS TO YOU?

7         A    SHE STATED THAT EARLIER IN THE DAY SHE

8    MADE CONTACT WITH -- MR. BENSON ATTEMPTED TO MAKE

9    CONTACT WITH HER AND HER CHILD BY SAYING HELLO. SHE

10   SAID SHE DID NOT FEEL COMFORTABLE WITH HIM BEING IN

11   THE PARK. SHE DID NOT RESPOND TO HIM. SHE KEPT

12   MOVING. THE TIME WE'RE TALKING ABOUT NOW IS WHEN HE

13   WAS ASKING ABOUT THE PANTIES WAS AFTER THE -- AFTER

14   THE SECOND ATTEMPT OF HIM MAKING CONTACT WITH HER

15   AND THE CHILD.

16        Q    ON THE SECOND OCCASION, WERE THEY ALREADY

17   AT THE LOCATION? HOW DID THEY COME INTO CONTACT

18   WITH THE DEFENDANT?

19        A    SHE STATED THAT HER AND HER CHILD WERE

20   SITTING ON SOME SWINGS, AND SHE NOTICED THAT

21   MR. BENSON WAS ON THE SWINGS ADJACENT TO WHERE THEY

22   WERE SITTING.

23        Q    OKAY. DID SHE SAY SHE RECOGNIZED HIM FROM

24   EARLIER?

25        A    YES.

5

1      Q      DID SHE GIVE AN APPROXIMATION OF THE TIME

2    BETWEEN THE FIRST TIME SHE SAW HIM AND THE SECOND

3    TIME?

4           A      NO, SHE DID NOT.

5                MS. NASERI:    CAN I HAVE ONE MOMENT, YOUR

6         HONOR?

7                THE COURT:    CERTAINLY.

8    BY MS. NASERI:

9      Q      YOU MENTIONED THAT YOU FOUND A WEAPON ON

10   THE DEFENDANT.  CAN YOU TELL THE COURT WHERE YOU

11   RECOVERED THE WEAPON AND HOW?

12          A      I ASKED HIM -- AS COMMON, WHEN I COME IN

13   CONTACT WITH ANYBODY AS A SUSPECT AT A CRIME, I ASK

14   IF THEY'RE CARRYING ANY WEAPONS ON THEIR PERSON, FOR

15   THE SAFETY OF MYSELF, THEIRSELF AND THE PEOPLE

16   AROUND US.  HE STATED, YES, HE HAD A PISTOL IN HIS

17   POCKET.  HE KIND OF POINTED TO HIS POCKET.  I

18   LOCATED THE POCKET DURING THE -- I LOCATED IT DURING

19   A PAT DOWN.  I LOCATED A PISTOL IN HIS FRONT RIGHT

20   PANT POCKET, AND I RETRIEVED A PISTOL AND UNLOADED

21   IT.  IT WAS A -- I BELIEVE IT WAS A 22 CALIBER

22   PISTOL.

23          Q      DID YOU SEE THAT IT WAS LOADED?

24          A      IT WAS LOADED WITH A MAGAZINE, SIX ROUNDS,

25   ONE ROUND IN THE CHAMBER, WHICH MEANS ALL YOU HAD TO

1    DO WAS PULL THE TRIGGER, AND THE BULLET WILL LEAVE

2    THE WEAPON.

3         Q     DID THE DEFENDANT MAKE ANY STATEMENTS

4    ABOUT WHY HE HAD THE WEAPON ON HIM?

5         A     DURING THE INVESTIGATION, HE STATED THAT

6    HE COMES TO CHASTAIN PARK BECAUSE HE WAS AFRAID OF

7    BEING MUGGED. HE LIVES IN STONE MOUNTAIN, AND THE

8    WEAPON IS FOR HIS PROTECTION.

9         Q     DID YOU SPECIFICALLY ASK HIM WHY HE CAME

10   TO THIS PARK?

11        A     YES. HE STATED BECAUSE HE DOES NOT WANT

12   TO BE MY MUGGED IN STONE MOUNTAIN.

13        Q     WHY DID YOU ASK HIM WHY HE CAME TO

14   CHASTAIN PARK; DO YOU RECALL?

15        A     TO DETERMINE IF HE IS A RESIDENT IN THE

16   AREA AND IF HE FREQUENTS THE PARK, WHAT HIS BUSINESS

17   WAS IN THE PARK, WHAT HIS INTENT WAS TO BE IN THE

18   PARK.

19             MS. NASERI:   NO FURTHER QUESTIONS AT THIS

20        TIME, YOUR HONOR.

21             THE COURT:   CROSS-EXAMINATION, MR. RUBIN.

22             MR. RUBIN:   THANK YOU, YOUR HONOR.

23                   CROSS EXAMINATION

24   BY MR. RUBIN:

25        Q     GOOD MORNING, OFFICER.

1          A    GOOD MORNING.

2          Q    OFFICER FACEMYER, YOU INDICATED THAT

3     YOU'VE BEEN ON THE POLICE FORCE THREE YEARS?

4          A    YES.

5          Q    ARE YOU ALWAYS ASSIGNED TO THE CHASTAIN

6     PARK AREA?

7          A    NO.

8          Q    HOW LONG HAVE YOU BEEN IN THAT AREA?

9          A    I'M ON A ROTATING -- WHAT'S CALLED A

10    ROUSTABOUT, SO I HAVE A DIFFERENT BEAT ASSIGNMENT

11    EVERY DAY.

12         Q    IN THE AREA IN WHICH MS. WOOD SAID THIS

13    INCIDENT OCCURRED, DO YOU KNOW IF THERE ARE ANY

14    SURVEILLANCE CAMERAS?

15         A    NOT TO MY KNOWLEDGE. I DO NOT KNOW OF ANY

16    CAMERAS.

17         Q    NOW, THE FIRST QUESTION WAS -- BY

18    MS. NASERI WAS WHAT DATE THIS OCCURRED. IS IT THE

19    21ST OR THE 22ND OF FEBRUARY?

20         A    WELL, THE INCIDENT REPORT STATES THE 22ND,

21    AND I'M GOING TO GO BY WHAT THE REPORT SAYS.

22         Q    MS. WOOD'S STATEMENT SAYS IT'S ON THE

23    21ST. DO YOU KNOW WHO IS CORRECT?

24         A    WELL, IF HER STATEMENT SAYS THE 21ST

25    THAT'S WHEN SHE WROTE IT OUT. I BELIEVE WHEN THE

8

1    REPORT SAYS THE 22ND IS WHEN THE ARREST WAS

2    COMPLETED -- THE PAPERWORK WAS COMPLETED. THAT

3    MIGHT BE THE DATE WE TALKED TO THE DISTRICT

4    ATTORNEY'S OFFICE.

5        Q     OKAY. NOW, YOU STATED YOU INTERVIEWED

6    MS. WOOD. DID YOU INTERVIEW ANYBODY ELSE?

7        A     SHE WAS THE ONLY WITNESS.

8        Q     WHO'S ROYCE HORNE?

9        A     MS. HORNE WAS THE LADY THAT MS. WOOD --

10   MS. WOOD DIDN'T HAVE A CELLPHONE ON HER, SO SHE

11   FLAGGED DOWN MS. HORNE, TOLD HER WHAT HAPPENED AND

12   REQUESTED TO USE HER PHONE TO CALL THE POLICE.

13       Q     OKAY. BUT MS. HORNE DIDN'T SEE ANYTHING

14   OR HEAR ANYTHING?

15       A     ONLY WHAT SHE WAS TOLD BY MS. WOOD.

16       Q     WAS IT MS. WOOD WHO CALLED 911?

17       A     YES.

18       Q     NOW, I KNOW FROM READING YOUR REPORT THAT

19   SERGEANT ORMOND AND DETECTIVE BAHRY AND DETECTIVE

20   NIXON RESPONDED TO THE SCENE. DO YOU KNOW WHAT THEY

21   DID?

22       A     THE SERGEANT WAS THERE TO -- AS A CUSTOM

23   FOR SUPERVISORS TO RESPOND TO CALLS SUCH AS THIS.

24   THE DETECTIVES ARE THE ONES WHO PRIMARILY INTERVIEW

25   AND DO THE SPEAKING TO THE SUSPECTS. SO DETECTIVE

1   BAHRY IS ZONE 2 CID, DETECTIVE GENERAL

2   INVESTIGATIONS.  DETECTIVE NIXON WORKS FOR, I

3   BELIEVE, EITHER SEX CRIMES UNIT OR THE CRIMES

4   AGAINST WOMEN AND CHILDREN, SO NATURALLY HE WOULD BE

5   CALLED TO THE SCENE ON THIS TYPE OF CASE.

6        Q     ALL RIGHT.  LET'S GO OVER THE ACTUAL

7   INCIDENT.  NOW, YOU STATED THAT MS. WOOD SAW

8   MR. BENSON ON AN OCCASION PRIOR TO THIS, IN THE

9   PARK?

10        A     YES.

11        Q     AND WHAT DID SHE TELL YOU HAPPENED DURING

12   THAT ENCOUNTER?

13        A     THE FIRST TIME?

14        Q     YES.

15        A     SHE STATED THAT HE ATTEMPTED TO MAKE

16   CONTACT, I BELIEVE, BY SAYING HELLO.  SHE STATED SHE

17   DID NOT FEEL COMFORTABLE OR FELT NERVOUS ABOUT HIM,

18   SO SHE DID NOT REPLY OR RESPOND.  SHE KEPT MOVING.

19        Q     DID SHE SAY WHY SHE DIDN'T FEEL

20   COMFORTABLE?

21        A     SHE JUST THOUGHT IT WAS -- ACCORDING TO

22   WHAT SHE SAID, SHE JUST THOUGHT IT WAS SUSPICIOUS

23   WHY HE WAS TALKING TO HER.

24        Q     SHE FELT IT WAS SUSPICIOUS THAT SOMEONE

25   WOULD SAY HELLO TO HER?

10

1        A     I DON'T KNOW WHY SHE FELT THAT WAY, BUT

2   SHE DID NOT FEEL COMFORTABLE WITH HIM TALKING TO

3   HER.

4        Q     DID SHE DESCRIBE IF HE WAS WEARING

5   ANYTHING SHE THOUGHT WAS WEIRD OR ACTING IN ANY WAY

6   THAT WAS STRANGE, OTHER THAN SAYING HELLO?

7        A     NO.

8        Q     THAT OCCURRED IN ONE AREA OF THE PARK

9   SEPARATE FROM WHERE THE INCIDENT LEADING TO THE

10  ARREST OCCURRED?

11       A     YES.

12       Q     NOW, IT'S TRUE THAT MR. BENSON WAS ON THE

13  SWINGS WITH A BOOK WHEN MS. WOOD CAME TO THOSE

14  SWINGS, CORRECT?

15       A     I DON'T KNOW ANYTHING ABOUT THE BOOK.  SHE

16  STATED SHE WAS ON SWINGS AND NOTICED THAT HE WAS ON

17  THE SWINGS ADJACENT TO HER.

18       Q     SO HE DIDN'T FOLLOW HER TO THE SWINGS.  HE

19  WAS THERE BEFORE SHE CAME TO THE SWINGS?

20       A     SHE DID NOT STATE THAT.  SHE STATED SHE

21  WAS ON THE SWINGS AND NOTICED HE WAS -- SOMEHOW HE

22  ENDED UP ON THE SWINGS ACROSS FROM HER.  SHE DID NOT

23  STATE WHO WAS THERE FIRST.

24       Q     DID YOU READ HER STATEMENT?

25       A     YES.

11

1    Q    DOES HER STATEMENT NOT SAY, "A MAN WAS

2   SITTING IN A PARK SWING ON THE OTHER SIDE OF

3   SOMETHING -- LAKE FAR SIDE.  WE SAT ON A PARK SWING

4   CLOSEST TO THE YOUTH ORGANIZATION"?

5    A    YES.  BUT THAT DOES NOT INDICATE IF SHE

6   FOLLOWED HIM OR HE FOLLOWED HER.

7    Q    WAS THERE ANY INDICATION THAT SHE GAVE YOU

8   THAT HE FOLLOWED HER?

9    A    THE WAY SHE WAS INDICATING, YES.

10    Q    WHAT WAS THE INDICATION?

11    A    SHE STATED TO ME THAT HE ATTEMPTED TO TALK

12   TO HER THE FIRST TIME.  UPON THE SECOND TIME HE

13   TALKED TO HER AGAIN.  SHE NOTICED THAT HE WAS ON THE

14   SWINGS THAT HER AND HER DAUGHTER SELECTED TO SIT ON

15   AND THAT WOULD SHOW THAT HE WAS FOLLOWING HER,

16   ACCORDING TO HER.

17    Q    IF SHE WAS THERE FIRST?

18    A    YEAH.

19    Q    WHERE IN HER STATEMENT DOES IT SAY THAT

20   SHE WAS THERE FIRST?

21    A    IT DOESN'T.

22    Q    OKAY.  WHERE IN YOUR STATEMENT DOES IT SAY

23   THAT SHE WAS THERE FIRST?

24    A    MY STATEMENT ONLY REPEATS WHAT SHE TOLD

25   ME.

1        Q     OKAY. SO DID SHE SEE HIM AT ANYTIME

2    BETWEEN THE FIRST TIME HE SAID HELLO AND THE SECOND

3    TIME HE SAID HELLO?

4        A     IF SHE DID, IT WAS NOT STATED TO THE

5    POLICE.

6        Q     NOW, AT SOME POINT DURING THE SECOND

7    OCCASION, HE APPROACHED HER AGAIN OR HER AND HER

8    DAUGHTER, CORRECT?

9        A     YES.

10       Q     AND WHAT IS IT THAT SHE SAID HAPPENED?

11       A     SHE STATED THAT MR. BENSON MADE CONTACT BY

12   SAYING HELLO, A GREETING.

13       Q     DID SHE FIND THAT STRANGE?

14       A     I ASSUME SHE WOULD FROM THE FIRST TIME.

15   HE STATED TO THE DAUGHTER -- I GUESS HE GAVE HER A

16   COMPLIMENT OF HER PRETTY DRESS SHE WAS WEARING.

17       Q     DON'T GUESS.

18       A     THAT'S WHAT SHE STATED TO ME, THAT HE MADE

19   A COMPLIMENT ABOUT THE DRESS SHE WAS WEARING.

20       Q     ANYTHING STRANGE ABOUT THAT?

21       A     NO.  THE DAUGHTER REPLIED BY SAYING IT'S A

22   PRETTY PINK DRESS.  AND SHE STATES THAT MR. BENSON

23   REPLIED TO THAT BY ASKING HER IF SHE WAS WEARING

24   PRETTY PINK PANTIES.

25       Q     WAS IT TO MATCH THE DRESS?

13

1      A      TO MATCH THE DRESS.

2      Q      RIGHT.  OKAY.  ANYTHING ELSE?

3      A      THE DAUGHTER LIFTED UP HER DRESS AND

4  STATED IT WAS PINK AND POINTED TO HER PANTIES.

5      Q      DO YOU KNOW HOW FAR UP THE DAUGHTER LIFTED

6  HER DRESS?

7      A      NO.

8      Q      DID MS. WOOD SHOW YOU HOW FAR UP THE

9  DAUGHTER LIFTED HER DRESS?

10      A      NO.

11      Q      DO YOU KNOW IF THE DAUGHTER ACTUALLY

12  PULLED IT UP LIKE THIS OR JUST A LITTLE BIT?

13      A      ALL I KNOW IS WHAT SHE TOLD ME.

14      Q      OKAY.  ANYTHING ELSE?

15      A      I BELIEVE THAT WAS IT.

16      Q      DURING THAT INCIDENT, DID MR. BENSON MAKE

17  ANY ATTEMPT TO TOUCH THE GIRL, THE DAUGHTER?

18      A      NOT THAT WAS TOLD THE POLICE, NO.

19      Q      OKAY.  AND YOU WOULD HAVE TRIED TO FIND

20  THAT OUT IF IT DID HAPPEN, RIGHT?

21      A      NOBODY TOLD THE POLICE THAT HE MADE ANY

22  PHYSICAL CONTACT WITH HER.

23      Q      DURING THAT CONFRONTATION OR INCIDENT WITH

24  MS. WOOD AND HER DAUGHTER, DID MR. BENSON EVER

25  EXPOSE HIMSELF?

1    A    NOT THAT WAS SAID TO THE POLICE, SO I HAVE

2    NO IDEA. I GUESS IT WOULD BE NO, BECAUSE NO ONE

3    SAID SO.

4    Q    THE ANSWER IS NO?

5    A    YES.

6    Q    OKAY. DO YOU HAVE ANY INFORMATION THAT HE

7    HAD AN ERECTION DURING THAT ACCOUNT?

8    A    I DON'T HAVE ANY INFORMATION ON THAT, NO.

9    Q    OKAY. DO YOU HAVE ANY INFORMATION THAT HE

10   DID ANYTHING OF A SEXUAL NATURE DURING THE ENCOUNTER

11   OTHER THAN COMMENT ON THIS LITTLE GIRL'S PRETTY PINK

12   DRESS AND HER MATCHING PANTIES?

13   A    NO.

14   Q    NOW, ONCE HE WAS ARRESTED, YOU CONDUCTED A

15   SEARCH, RIGHT?

16   A    SEARCH OF HIS PERSON, YES.

17   Q    HE HAD A FANNY PACK?

18   A    YES.

19   Q    WHAT WAS IN THE FANNY PACK?

20   A    SOME PERSONAL PAPERS.

21   Q    ANYTHING THAT YOU THINK WOULD BE LINKED TO

22   SOMEONE WHO'S LOOKING TO MOLEST CHILDREN?

23   A    NO.

24   Q    IF THERE WAS, YOU WOULD HAVE TAKEN THAT

25   INTO EVIDENCE, CORRECT?

15

1      A    CORRECT.

2      Q    AND YOU DIDN'T TAKE ANYTHING LIKE THAT?

3      A    NO.

4      Q    OKAY.  HE HAD IN HIS -- I THINK YOU SAID

5  RIGHT FRONT POCKET OR LEFT POCKET -- A GUN?

6      A    YES.

7      Q    OKAY.  HE HAD A PERMIT FOR THE GUN?

8      A    YES, HE DID.

9      Q    AND IT WAS A CONCEALED WEAPON PERMIT?

10     A    YES.

11     Q    SO THAT WAS LEGAL TO CARRY THE GUN?

12     A    YES, IT WAS.

13     Q    ANY INDICATION FROM MS. WOOD OR ANY OTHER

14  WITNESS THAT HE ATTEMPTED TO SHOW THEM THE GUN FOR

15  ANY REASON?

16     A    SHE HAD NO IDEA HE HAD THE GUN.

17     Q    SO THE ANSWER'S NO?

18     A    THE ANSWER IS NO.

19     Q    AT SOME POINT DID HE TELL YOU OR THE OTHER

20  OFFICERS INVOLVED WHERE HIS VAN WAS, HIS CAR?

21     A    YES, HE DID.

22     Q    DID YOU OR ANY OF THE OFFICERS SEARCH THE

23  CAR?

24     A    YES, WE DID A INVENTORY OF THE VEHICLE

25  UPON THE IMPOUNDING OF IT.

1    Q     ANYTHING IN THE CAR THAT YOU WOULD

2    CONSIDER INDICATIVE OF SOMEONE WHO IS TRYING TO LURE

3    OR ENTICE OR MOLEST CHILDREN?

4         A     NOTHING IN THE VEHICLE, NO.

5         Q     IF THERE WAS, YOU WOULD HAVE SEIZED IT?

6         A     CORRECT.

7         Q     NOW, YOU SAID THAT AT THE TIME OF THE

8    ENCOUNTER, THEY WERE ABOUT 3 FEET APART?

9         A     YES.

10        Q     OKAY. DID THE CHILD APPEAR AFRAID OFF

11   MR. BENSON, ACCORDING TO MS. WOOD?

12        A     SHE DID NOT STATE ANYTHING LIKE THAT. THE

13   CHILD IS ONLY TWO AND A HALF YEARS OLD.

14        Q     DID MR. BENSON DO ANYTHING TO TRY TO GET

15   THE MOTHER AND DAUGHTER OR DAUGHTER ALONE WITH HIM

16   AWAY FROM THE PUBLIC PARK?

17        A     NO.

18        Q     DID YOU INTERVIEW MR. BENSON?

19        A     BRIEFLY.

20        Q     BEFORE YOU INTERVIEWED HIM, DID YOU CALL

21   IN TO SEE WHETHER HE HAD ANY OUTSTANDING WARRANTS OR

22   HOLDS ON HIM OR ANYTHING LIKE THAT?

23        A     YES, HE WAS CHECKED ON G.C.I.C. AND

24   N.C.I.C.

25        Q     ARE YOU AWARE OF ANY PRIOR RECORDS?

17

1          A     NO, I AM NOT.

2          Q     NO, YOU ARE NOT?

3          A     I WAS NOT MADE AWARE OF ANY PRIOR RECORD.

4    THE DETECTIVES DID A HISTORY ON HIM.  HE HAS NO

5    PRIOR RECORD, NO WARRANTS FOR HIS ARREST.

6          Q     NOW, PEOPLE -- CHASTAIN PARK IS MADE FOR

7    PEOPLE TO WALK IN, CORRECT?

8          A     YES.

9          Q     PEOPLE FROM ALL OVER THE CITY CAN WALK IN

10   CHASTAIN PARK?

11         A     YES.

12         Q     NOTHING SUSPICIOUS ABOUT BEING IN CHASTAIN

13   PARK WALKING?

14         A     NO.

15         Q     DID YOU ASK MS. WOOD WHY SHE THOUGHT THE

16   COMMENT BY MR. BENSON WAS FOR THE PURPOSE OF SEXUAL

17   GRATIFICATION?

18         A     NO, I DID NOT.

19         Q     AND YOU UNDERSTAND SEXUAL GRATIFICATION IS

20   AN ELEMENT OF THE CRIME OF CHILD MOLESTATION?

21         A     YES, I DO.

22         Q     SO WHAT IS THE EVIDENCE THAT YOU BASED

23   YOUR ARREST ON THAT HE HAD DONE SOMETHING TO, WITH

24   OR IN FRONT OF THE CHILD, FOR THE PURPOSE OF SEXUAL

25   GRATIFICATION?

1          A     WELL, FOR SECOND -- HE MADE IT ON THE

2     SECOND ATTEMPT. HE MADE COMMENTS ABOUT THE CHILD'S

3     UNDERGARMENTS OR PANTIES, WHICH SHOWED HE WAS TRYING

4     TO MAKE CONTACT WITH THE CHILD. MR. BENSON ACTED

5     OUTSIDE THE SCOPE WHICH IS REASONABLE TO COMMON

6     BEHAVIOR, WHICH WOULD BE CONSIDERED APPROPRIATE

7     BEHAVIOR. SO THAT WOULD SHOW THAT IF HE WAS NOT

8     ACTING WITHIN THE REASONABLE SCOPE OF COMMON OR

9     APPROPRIATE BEHAVIOR, IT WOULD PROVE THAT HE WAS

10    HAVING -- ACTING IN A DEVIANT BEHAVIOR. HIS SOLE

11    PURPOSE WAS TO MAKE CONTACT WITH THE CHILD AND SPEAK

12    TO HER ABOUT THE COLOR OF HER UNDERGARMENTS, WHICH

13    WOULD RESULT IN HIS SEXUAL GRATIFICATION.

14         Q     SO IT'S YOUR UNDERSTANDING OF THE LAW OF

15    CHILD MOLESTATION IF SOMEONE COMMENTS ON A TODDLERS

16    SUPERMAN PANTIES, UNDERPANTS, OR BARBIE PANTIES OR

17    MATCHING PRETTY PINK PANTIES, THAT'S INDICATIVE OF

18    SOMEONE ATTEMPTING TO MOLEST A CHILD?

19         A     THE LAW ON CHILD MOLESTATION STATES THAT

20    ANY ACTION YOU TAKE TOWARDS THE CHILD WHICH WOULD

21    RESULT IN THE CHILD'S SEXUAL GRATIFICATION OR THE

22    SEXUAL GRATIFICATION OF YOURSELF WOULD RESULT IN

23    CHILD MOLESTATION. YOU DON'T HAVE TO TOUCH THE

24    CHILD. ANYTHING THAT YOU DO WHICH RESULTS IN YOUR

25    GRATIFICATION OR EXCITEMENT, IN THIS CASE HIM ASKING

1    HER ABOUT HER PANTIES.

2          Q     HOW DID THAT RESULT IN HIS EXCITEMENT?

3    THAT'S WHAT I'M TRYING TO GET TO.

4          A     WHY WOULD A 65-YEAR-OLD MAN TALK TO A

5    2-YEAR-OLD GIRL ABOUT HER PANTIES? BECAUSE HE IS

6    INTERESTED IN HEARING ABOUT IT. SO THAT WOULD

7    GRATIFY HIS SEXUAL NEEDS.

8          Q     SO THAT GOES BACK TO MY QUESTION. SO

9    ASKING A CHILD ABOUT HIS UNDERPANTS OR PANTIES OR,

10   YOU KNOW, BARNEY OR BARBIE OR ANYTHING LIKE THAT,

11   THAT'S INDICATIVE OF A CHILD MOLESTATION?

12         A     IF IT RESULTS IN HIS SEXUAL GRATIFICATION,

13   YES.

14         Q     WHAT'S THE EVIDENCE OF SEXUAL

15   GRATIFICATION?

16               MS. NASERI:   YOUR HONOR, I WOULD ASK THAT

17          THIS ARGUMENT BE HELD FOR CLOSING. HE IS

18          ENGAGING IN A LEGAL ARGUMENT WITH THE POLICE

19          OFFICER.

20               MR. RUBIN:   I'M JUST TRYING TO FIND OUT

21          THE BASIS OF THE ARREST.

22               THE COURT:   OVERRULED.

23   BY MR. RUBIN:

24         Q     WHAT'S THE EVIDENCE OF SEXUAL

25   GRATIFICATION?

1          A       THE FACT THAT A 60-SOMETHING-YEAR-OLD MAN

2     WOULD MAKE CONTACT WITH A 2-YEAR-OLD FEMALE FOR THE

3     SOLE PURPOSE OF ASKING HER ABOUT THE COLOR OF HER

4     PINK PANTIES WOULD BE THE ONLY REASON THAT I, AS A

5     REASONABLE PERSON, WOULD BELIEVE WHY HE WAS DOING

6     THAT, WAS TO RESULT IN HIS OWN SEXUAL GRATIFICATION.

7          Q       AND YOU'RE ASSUMING IT'S THE SOLE PURPOSE

8     OF THE CONTACT, WAS TO ASK ABOUT THE PANTIES,

9     CORRECT?

10         A       YES.

11         Q       WHY DO YOU THINK IT'S THE SOLE PURPOSE OF

12    SAYING HI TO A LITTLE GIRL, IS TO ASK HER ABOUT HER

13    PANTIES?

14         A       HE ALREADY SAID HI TO HER ONCE. WHY DOES

15    HE NEED TO COME SAY IT TWICE?

16         Q       OKAY. WHEN THE DETECTIVES INTERVIEWED

17    MR. BENSON, WHAT DID HE SAY?

18         A       HE STATED THE SAME THING THAT HE STATED TO

19    ME.

20         Q       OKAY. WHICH WAS?

21         A       WHICH WAS, AFTER THE ALLEGED COMMENTS HE

22    MADE TOWARD THE CHILD, HIS SIDE OF THE STORY IS

23    THAT, YES, HE MADE CONTACT WITH THE CHILD. YES, HE

24    GAVE HER A COMPLIMENT ABOUT HER DRESS. THE CHILD

25    STATED IT WAS A PRETTY PINK DRESS AND SHOWED HIM --

21

1    PRESENTED HER PANTIES TO HIM BY LIFTING UP HER

2    DRESS. HE RESPONDED TO THAT BY STATING THAT HIS

3    DAUGHTER ALSO HAS PINK PANTIES.

4         Q    ANYTHING, AGAIN, INDICATIVE OF CHILD

5    MOLESTATION IN THAT REMARK?

6         A    AGAIN, I'LL GO BACK TO WHAT I WAS --

7    EARLIER WHAT I WAS SAYING. WHY WOULD HE EVEN ENGAGE

8    A 2-YEAR-OLD IN CONVERSATION ABOUT HER PANTIES?

9         Q    DO YOU HAVE ANY CHILDREN?

10        A    NO, I DO NOT.

11        Q    THEN YOU DON'T KNOW.

12        A    OKAY.

13        Q    DID YOU SEIZE HIS CELLPHONE?

14        A    HIS CELLPHONE WAS TAKEN TO POLICE

15   PROPERTY.

16        Q    DID ANYBODY LOOK AT THE CELLPHONE TO SEE

17   IF THERE WAS ANY PICTURES OF THIS LITTLE GIRL ON HIS

18   CELLPHONE OR ANYTHING LIKE THAT?

19        A    NOT TO MY KNOWLEDGE, NO.

20        Q    THAT WOULD BE EVIDENCE OF KIND OF WEIRD

21   BEHAVIOR, WOULDN'T IT?

22        A    IF HE HAD SOMETHING THAT WOULD PROVE HE

23   WAS LOOKING AT CHILD PORN OR SOMETHING, YES, IT

24   WOULD.

25        Q    ANY EVIDENCE HE WAS LOOKING AT CHILD PORN

1    AT ANY TIME?

2         A    WE HAVE NOT -- I HAVE NOT LOOKED IN HIS

3    CELLPHONE OR HIS COMPUTER.  I HAVE NO IDEA.

4              MR. RUBIN:   THAT'S ALL I HAVE, YOUR HONOR.

5              THE COURT:   ANY REDIRECT, MS. NASERI?

6                   REDIRECT EXAMINATION

7    BY MS. NASERI:

8         Q    OFFICER FACEMYER, YOU INDICATED THAT THE

9    DEFENDANT WAS WEARING A FANNY PACK; IS THAT CORRECT?

10        A    YES.

11        Q    WHERE WAS THE FANNY PACK LOCATED?

12        A    AROUND HIS WAIST.

13        Q    WHERE WAS IT SITUATED ON HIS WAIST?  DO

14   YOU RECALL?

15        A    I CAN'T REMEMBER.

16             MS. NASERI:   NO FURTHER QUESTIONS.

17             THE COURT:   ANY RECROSS, MR. RUBIN?

18             MR. RUBIN:   NO, YOUR HONOR.

19             THE COURT:   YOU MAY STEP DOWN.

20             THE WITNESS:   THANK YOU, YOUR HONOR.

21             THE COURT:   THANK YOU.

22             ANY OTHER WITNESSES, MS. NASERI?

23             MS. NASERI:   NO, YOUR HONOR.

24             THE COURT:   ANY OTHER WITNESSES,

25        MR. RUBIN?

23

1        MR. RUBIN:   YES, YOUR HONOR.  BRANDY HUFF.

2                        BRANDY HUFF,

3    HAVING BEEN FIRST DULY SWORN, WAS EXAMINED AND TESTIFIED AS

4    FOLLOWS:

5                     DIRECT EXAMINATION

6    BY MR. RUBIN:

7        Q    SPELL YOUR LAST NAME, PLEASE.

8        A    BRANDY IS B-R-A-N-D-Y.  HUFF, H-U-F-F.

9        Q    MS. HUFF, WHAT DO YOU DO FOR A LIVING?

10       A    I'M A PRIVATE INVESTIGATOR.

11       Q    WHO DO YOU WORK WITH FOR YOUR LICENSE?

12       A    ELITE INVESTIGATION SERVICES.

13       Q    DID YOU TALK TO ME ABOUT THIS CASE?

14       A    YES, SIR.

15       Q    WERE YOU ASKED TO DO SOMETHING?

16       A    YES, SIR.

17       Q    WOULD YOU TELL THE COURT WHAT YOU WERE

18   ASKED TO DO?

19       A    I WAS ASKED TO GO TO MR. BENSON'S HOME AND

20   CHECK TO SEE IF THERE WAS ANYTHING IN THE HOUSE.  I

21   DID AN INVENTORY OF HIS HOUSE, BASICALLY WENT

22   THROUGH.

23       Q    WHAT'S THE LOCATION OF THE HOME?

24       A    IT IS IN STONE MOUNTAIN, ON ANTEBELLUM.

25       Q    WHAT DAY DID YOU GO TO THE HOME?

1       A    ON TUESDAY MARCH 4TH, 5TH.  IT WAS THIS

2  LAST TUESDAY.

3       Q    OKAY.  A WEEK AGO?

4       A    A WEEK AGO.

5       Q    OKAY.  WHO WAS WITH YOU AT THE HOME?

6       A    NO, I'M SORRY.  WHAT IS TODAY?

7       Q    TODAY IS WEDNESDAY.

8       A    TODAY IS WEDNESDAY.  IT WAS MONDAY.  I'M

9  SORRY.  IT WAS THIS PAST MONDAY.

10      Q    MARCH 7TH?

11      A    MARCH 7TH, MONDAY MARCH 7TH.

12      Q    MONDAY MARCH 7TH?

13      A    YES.

14      Q    OKAY.  WHO WAS WITH YOU AT THE HOME?

15      A    MR. BENSON'S SON-IN-LAW ALEX KNUDSEN.  HE

16  WAS THE ONE THAT LET ME INTO THE HOME.

17      Q    OKAY.  DID IT APPEAR THAT THE POLICE HAD

18  BEEN TO THE HOME AT THE TIME YOU WENT THERE?

19      A    NO.

20      Q    TELL THE COURT WHAT YOU DID IN THE HOME TO

21  INVENTORY THE HOME.

22      A    WE WENT THROUGH -- OR I WENT THROUGH EVERY

23  ROOM, STARTED IN THE KITCHEN.  HE HAD SOME MAIL AND

24  STUFF ON THE TABLE, SO I WENT THROUGH ALL HIS MAIL.

25  THEN WE WENT TO -- I BELIEVE WE WENT UPSTAIRS TO THE

1    BEDROOM AND STARTED IN THE BEDROOMS UP THERE AND
2    INVENTORIED EVERYTHING. WE CHECKED -- HE HAD
3    PROBABLY 2000 PICTURES THAT WE WENT THROUGH. AND I
4    WENT THROUGH EVERY PICTURE TO SEE.
5        Q    I'LL JUST KIND OF STOP YOU ALONG THE WAY.
6    IN THE COURSE OF REVIEWING THOSE 2000 PICTURES, DID
7    YOU SEE ANY PICTURES THAT WOULD BE OF NAKED CHILDREN
8    OR ANYTHING INDICATIVE OF CHILD PORNOGRAPHY?
9        A    NOT AT ALL. THEY WERE FAMILY PICTURES AND
10   VACATION PICTURES. PICTURES OF HIS DAUGHTER WHEN
11   SHE WAS YOUNGER. YOU CAN TELL BY THE FINISH ON THE
12   PHOTOS THEY WERE OLDER. I EVEN HAD MR. KNUDSEN
13   VERIFY THAT THOSE WERE HER. THEN WE WENT TO THE
14   NEXT ROOM, WHICH WAS HIS OFFICE. HIS COMPUTER WAS
15   SO OLD I COULDN'T EVEN POWER IT UP. I MEAN THERE
16   WAS NO -- WE LOOKED THROUGH THE DESK, THROUGH ALL
17   THE STUFF. I MEAN I DID TRY TO POWER UP THE
18   COMPUTER. IT WOULD NOT COME ON. THE MONITOR CAME
19   ON, BUT THE COMPUTER DID NOT. THERE WAS NO DISKS.
20   THERE WAS NO CDS. I DON'T EVEN KNOW IF THAT
21   COMPUTER HAD A CD DRIVE, TO BE HONEST. I COULDN'T
22   GET ANYTHING TO OPEN. I BELIEVE IT WAS THE OLD
23   VERSION.
24       Q    FLOPPY DISK?
25       A    YES. I WENT THROUGH ALL THE DRAWERS.

26

1   THERE WAS JUST A LOT OF OFFICE PAPERWORK. SINCE HE

2   IS A CHIROPRACTOR, THERE WAS A LOT OF CHIROPRACTIC

3   FILES AND THAT KIND OF STUFF. THAT WAS IN THE

4   OFFICE. THEN HE -- I THINK IT'S HIS SISTER THAT

5   JUST PASSED AWAY. IT WAS SOMEBODY THAT JUST PASSED

6   AWAY IN THE FAMILY. SHE HAD A LOT OF -- HER

7   PERSONAL PROPERTY WAS -- YOU KNOW, FILES AND THAT

8   KIND OF THING, I WENT THROUGH THAT. THEN I WENT

9   THROUGH LEAH, WHICH IS HIS DAUGHTER'S BEDROOM.

10   THERE WAS STUFFED ANIMALS ON THE BED FROM WHEN SHE

11   WAS A KID. THERE WAS SOME STUFF, LIKE SOME

12   TROPHIES, CERTIFICATES STILL ON THE WALL WITH HER

13   NAME. I WENT THROUGH THAT CLOSET. NOTHING IN

14   THERE. IT WAS ALL CLOTHES. HE DOES HAVE A LOT OF

15   CLOTHES. THEN WE WENT TO THE SPARE BEDROOM. THERE

16   WAS JUST A NORMAL SIZE BED, FURNITURE, AND THEN WE

17   WENT THROUGH THAT CLOSET, SAME THING. ANOTHER ROOM

18   IT WAS CHRISTMAS DECORATIONS, BOOKS ON HISTORY AND

19   THAT KIND OF THING. I FLIPPED THROUGH SOME OF THE

20   BOOKS, AND THEN WE WENT DOWNSTAIRS IN HIS -- HE'S

21   GOT A LIVING ROOM AND DINING ROOM COMBINATION.

22   THERE WERE A LOT OF FILES IN THERE, ALL HIS

23   CHIROPRACTIC FILES. I THINK SOME WERE '91, '89. I

24   OPENED EVERY BOX AND LOOKED THROUGH EVERY SINGLE

25   BOX.

1          Q     ANYTHING INDICATIVE OF CHILD PORNOGRAPHY?

2          A     NO.

3          Q     DID YOU LOOK AT DVDS OR VHS TAPES?

4          A     YES.  WE GOT INTO THE FAMILY ROOM, AND

5    THERE IS -- HIS TV SITS ON THIS SHELF, AND IT'S GOT

6    SOME BOOKS AND STUFF.  THERE WAS A LOT OF RECIPES IN

7    THE BOOKS, AND THEN THERE WAS SOME VCR TAPES.  ONE

8    OF THEM WAS MARKED, IT'S A WONDERFUL LIFE, AND THEN

9    THERE WERE THREE OR FOUR VCR TAPES THAT WERE NOT

10   LABELED, SO ALEX SET UP THE VCR.  IT WASN'T EVEN

11   HOOKED UP.  AND WE LOOKED AT EVERY BLANK VCR TAPE.

12   THERE WAS A STAR TREK EPISODE ON ONE OF THEM, AND

13   THE OTHER ONES WERE TOTALLY BLANK.

14         Q     NOTHING INDICATIVE, AGAIN, OF CHILD

15   PORNOGRAPHY?

16         A     NO.

17         Q     ANYTHING NOT JUST -- NOT JUST PHOTOGRAPHS,

18   BUT ANYTHING INDICATIVE OF SOMEONE WHO'S TRYING TO

19   LURE CHILDREN, ENTICE CHILDREN, GET HIS HANDS ON

20   CHILDREN, ANYTHING THAT YOU THOUGHT WAS SUSPICIOUS

21   OF THAT?

22         A     NOT AT ALL.

23         Q     HOW LONG WERE YOU AT THE HOUSE?

24         A     LIKE TWO HOURS, TWO HOURS AND 15 MINUTES.

25               MR. RUBIN:   THAT'S ALL I HAVE OF MS. HUFF.

1          THE COURT:   CROSS-EXAMINATION, MS. NASERI.

2                      CROSS-EXAMINATION

3     BY MS. NASERI:

4          Q     MS. HUFF; IS THAT CORRECT?

5          A     HUFF, YES, MA'AM.

6          Q     MS. HUFF, HOW LONG HAVE YOU BEEN A PRIVATE

7     INVESTIGATOR?

8          A     YEAR AND A HALF.

9          Q     FOR THAT ENTIRE TIME, HAVE YOU BEEN WITH

10    ELITE INVESTIGATION SERVICES?

11         A     YES. I WORK FOR ANOTHER COMPANY ALSO.

12         Q     OKAY.  DO YOU HAVE ANY KIND OF -- WHAT

13    EXACTLY DO YOU HAVE TO DO TO BECOME A PRIVATE

14    INVESTIGATOR?  WHAT KIND OF SCHOOLING OR WHAT KIND

15    OF --

16         A     WELL, I STARTED AT 18 AS A PARALEGAL WITH

17    SOME OTHER ATTORNEYS AND WORKED THERE FOR TEN YEARS.

18    THEN I TOOK A CLASS.  IT WAS A -- I WANT TO SAY IT

19    WAS A TEN-WEEK COURSE, TO GET YOUR PRIVATE

20    INVESTIGATION LICENSE.

21         Q     YOU ARE CURRENTLY LICENSED?

22         A     YES, MA'AM.

23         Q     ABOUT HOW MANY CASES HAVE YOU

24    INVESTIGATED?

25         A     THIRTY-FIVE OR 40.

1      Q      WHAT KIND OF CASES DO YOU PARTICULARLY

2   INVESTIGATE?

3      A      THERE'S NO REAL PARTICULAR -- IT'S

4   CRIMINAL, CHILD MOLESTATION.

5      Q      HOW MANY CHILD MOLESTATION CASES?

6      A      EIGHT.

7      Q      WHAT ARE YOU TYPICALLY LOOKING FOR WHEN

8   YOU'RE INVESTIGATING A CHILD MOLESTATION CASE?

9      A      EVIDENCE OF ANY CRIME.

10      Q      FOR EXAMPLE?

11      A      I DO A LOT OF INTERVIEWING WITNESSES, GO

12   TO THE HOUSES, CHECK THINGS.  WE DO -- I MEAN

13   BASICALLY WE DO -- I DO A LOT OF INTERVIEWING.  I DO

14   A LOT OF SUBPOENAS, SITE VISITS OF THE HOMES, OF THE

15   RESIDENCES, OR WHERE THE ALLEGED INCIDENT OCCURRED.

16      Q      YOU WERE HIRED BY MR. RUBIN; IS THAT

17   CORRECT?

18      A      YES.  WELL, HE HIRES MY BOSS AND THEN --

19   YES.

20      Q      OKAY.  DID YOU INTERVIEW ANYONE IN THIS

21   CASE?

22      A      NO.

23      Q      YOU SAID YOU DID PREPARE A REPORT IN THIS

24   CASE?

25      A      YES, MA'AM.

30

1        Q      I DO HAVE A COPY THAT I JUST RECEIVED FROM

2    THE DEFENSE ATTORNEY, MR. RUBIN.

3                    MS. NASERI:   MAY I APPROACH, YOUR HONOR.

4                    THE COURT:   CERTAINLY.

5    BY MS. NASERI:

6        Q      IS THIS A COPY OF THE REPORT THAT YOU

7    PREPARED?

8        A      YES.

9        Q      IS THERE ANYTHING IN THAT REPORT THAT YOU

10   FAILED TO MENTION ON DIRECT EXAMINATION THAT WAS

11   LOCATED IN THE HOME?

12       A      PROBABLY, YES.

13       Q      WAS THERE ANYTHING LOCATED IN THE HOME OF

14   A SEXUAL NATURE?

15       A      OF A SEXUAL NATURE?

16       Q      YES.

17       A      YES.

18       Q      CAN YOU PLEASE TELL THE COURT WHAT WAS

19   FOUND?

20       A      A BOX OF CONDOMS AND K-Y JELLY.

21       Q      WHERE WAS THAT LOCATED?

22       A      IN THE NIGHTSTAND NEXT TO HIS BED.

23       Q      IS THERE ANY MENTION IN YOUR REPORT OF A

24   LAPTOP COMPUTER?

25       A      YES.

1          Q     CAN YOU TELL THE COURT WHAT YOUR REPORT

2     SAYS ABOUT THAT?

3          A     MR. NELSON DID INFORM ME THAT HE THINKS

4     THAT MR. BENSON HAS A LAPTOP, BUT HE WAS NOT SURE

5     WHERE THE COMPUTER WAS AT THE TIME.

6          Q     DID YOU RECOVER A LAPTOP IN THE HOME?

7          A     NO.

8          Q     OKAY. AND YOU MENTIONED THAT YOU WENT

9     THROUGH THE DEFENDANT'S DAUGHTER'S ROOM; IS THAT

10    CORRECT?

11         A     YES.

12         Q     DOES THE DAUGHTER STILL LIVE AT HOME WITH

13    THE DEFENDANT?

14         A     NO.

15         Q     DO YOU KNOW HOW OLD THE DAUGHTER IS?

16         A     THIRTY-SEVEN, 38.

17         Q     OKAY. SO SHE'S NOT A CHILD?

18         A     NO.

19              MS. NASERI:   NO FURTHER QUESTIONS, YOUR

20         HONOR.

21              THE COURT:   ANY REDIRECT, MR. RUBIN?

22              MR. RUBIN:   YES.

23                    REDIRECT EXAMINATION

24    BY MR. RUBIN:

25         Q     MS. HUFF, ANY INDICATION THE CONDOMS AND

1   K-Y JELLY NEXT TO AN ADULT MALE'S NIGHTSTAND OR IN

2   HIS NIGHTSTAND IS INDICATIVE OF CHILD MOLESTATION?

3            MS. NASERI:   YOUR HONOR, CALLS FOR

4       SPECULATION.

5   BY MR. RUBIN:

6       Q     ANY EVIDENCE THE ITEMS YOU FOUND IN THE

7   NIGHTSTAND WERE USED TO ENTICE AND LURE CHILDREN

8   INTO THE LAIR?

9       A     NO.

10           THE COURT:   ANY RECROSS?

11           MS. NASERI:   NO, YOUR HONOR.

12           THE COURT:   YOU MAY STEP DOWN.

13           ANY OTHER WITNESSES, MR. RUBIN?

14           MR. RUBIN:   NO, YOUR HONOR, NOT ON THE

15       ISSUE OF PROBABLE CAUSE.  WE DO HAVE A NUMBER

16       OF PEOPLE ON THE OTHER ISSUES.

17           THE COURT:   ANYTHING FURTHER MS. NASERI?

18           MS. NASERI:   NO, YOUR HONOR, JUST CLOSING.

19           THE COURT:   CLOSING.

20           MS. NASERI:   YOUR HONOR, THE STATE ASKS

21       THAT THE COURT FIND PROBABLE CAUSE ON ONE COUNT

22       OF CHILD MOLESTATION AND ONE COUNT OF

23       POSSESSION OF A FIREARM DURING THE COMMISSION

24       OF A FELONY.  THE COURT HEARD EVIDENCE THAT THE

25       DEFENDANT APPROACHED A 2-AND-A-HALF-YEAR-OLD

1    CHILD IN THE PARK AND INQUIRED ABOUT THE COLOR

2    OF HER PANTIES. THE STATE CONTENDS THAT THAT

3    IS AN IMMORAL OR INDECENT ACT DONE IN THE

4    PRESENCE OF A CHILD UNDER THE AGE OF 16, WITH

5    THE INTENT TO AROUSE OR SATISFY THE SEXUAL

6    DESIRES OF EITHER THE CHILD OR THE DEFENDANT.

7    YOUR HONOR, PURSUANT TO BOWMAN V STATE 227

8    GEORGIA APPELLATE 598 AND HICKS V THE STATE,

9    254 GEORGIA APPELLATE 814, THE MOLESTATION ACTS

10   CAN BE ENTIRELY VERBAL. THERE IS NO

11   REQUIREMENT THAT THE ACT HAVE ANY TOUCHING

12   INVOLVED. YOU ALSO HEARD EVIDENCE THAT ONCE

13   THE DEFENDANT WAS PLACED UNDER ARREST, THE

14   OFFICER DID RECOVER A LOADED FIREARM WITH A

15   BULLET IN THE CHAMBER. WE DO ASK THAT YOU FIND

16   PROBABLE CAUSE FOR THAT CHARGE AS WELL.

17          THE COURT:  MR. RUBIN.

18          MR. RUBIN:  YOUR HONOR, THIS IS ONE OF THE

19   SCARIEST CASES I THINK I'VE SEEN IN 25 YEARS OF

20   PRACTICING LAW. WHEN IT IS A CRIME TO TALK TO

21   A MOM AND HER DAUGHTER EVEN ABOUT WHAT COLOR

22   THE GIRL'S PANTIES ARE OR WHETHER THEY ARE A

23   CARTOON CHARACTER OR WHATEVER IT IS, WHEN

24   THAT'S A CRIME, THEN YOU MAY AS WELL JUST LOCK

25   US ALL UP. I HAVE RAISED TWO DAUGHTERS.

34

1      THEY'RE OLDER NOW.  I CAN'T TELL YOU HOW MANY

2      TIMES THEY WERE SO PROUD OF THEIR PANTIES AND

3      WANTED TO TALK ABOUT THEM AND COULDN'T WAIT TO

4      SHOW YOU THEM THAT THEY WOULD ESSENTIALLY WALK

5      AROUND WITH THEIR DRESS UP OVER THEIR HEAD.  IT

6      IS NOT A CRIME, AND THERE IS NO INDICATION FROM

7      OFFICER FACEMYER'S TESTIMONY OR ANYTHING ELSE

8      THE STATE HAS PRESENTED THAT THE COMMENT OR THE

9      CONVERSATION BETWEEN MR. BENSON AND AMY WOOD

10      AND HER DAUGHTER WAS FOR THE PURPOSE OF SEXUAL

11      GRATIFICATION.  AND I AGREE WITH THE STATE.

12      WORDS ALONE CAN FORM THE BASIS OF A CHILD

13      MOLESTATION CHARGE.  THE DEFINITION OF CHILD

14      MOLESTATION IS DOING AN ACT TO A CHILD, WITH A

15      CHILD, OR IN FRONT OF A CHILD FOR THE PURPOSE

16      OF YOUR'S OR THE CHILD'S SEXUAL GRATIFICATION.

17      I DON'T THINK THE STATE'S CONTENDING THE

18      COMMENT WAS MADE FOR THE CHILD'S SEXUAL

19      GRATIFICATION, SO THE ISSUE IS, IS THERE ANY

20      EVIDENCE TO SUPPORT A FINDING OF PROBABLE CAUSE

21      THAT THE COMMENT WAS DONE FOR MR. BENSON'S

22      SEXUAL GRATIFICATION.  WERE HIS PANTS OPEN?

23      DID HE HAVE HIS HAND DOWN HIS PANTS?  DID HE

24      ATTEMPT TO TOUCH THE CHILD OR LURE THE CHILD?

25      THAT'S WHY I ASKED ALL THOSE QUESTIONS OF

1    OFFICER FACEMYER.  THERE HAS GOT TO BE

2    SOMETHING ELSE BESIDES A COMMENT.  THE COMMENT

3    IN AND OF ITSELF IS NOT A SEXUAL COMMENT.  I

4    DON'T HAVE TO GIVE EXAMPLES OF THOSE, WE KNOW

5    WHAT AN INAPPROPRIATE COMMENT WOULD BE TO A

6    CHILD.  COMMENTING ON THE CHILD'S CLOTHING,

7    EVEN USING THE WORD "PANTIES" IS NOT CHILD

8    MOLESTATION.  WE WOULD ASK THE COURT TO DISMISS

9    THIS CASE.

10   THE COURT:  THE COURT HAS CONSIDERED THE

11   TESTIMONY PRESENTED.  THE COURT FINDS NO

12   PROBABLE CAUSE ON ONE COUNT OF CHILD

13   MOLESTATION AND ONE COUNT OF POSSESSION OF A

14   FIREARM DURING THE COMMISSION OF A FELONY.  IT

15   IS SO NOTED.  MR. BENSON, UNLESS SOMETHING ELSE

16   IS HOLDING HIM, SHOULD BE IMMEDIATELY RELEASED.

17   (WHEREUPON, THE PROCEEDINGS CONCLUDED.)

18

19

20

21

22

23

24

25

1

2

3                    C E R T I F I C A T E

4

5      STATE OF GEORGIA:

6      COUNTY OF FULTON:

7

8          I HEREBY CERTIFY THAT THE FOREGOING PAGES

9          REPRESENT A TRUE, COMPLETE, AND CORRECT

10         TRANSCRIPT OF THE PROCEEDINGS TAKEN DOWN BY ME

11         IN THE CASE AFORESAID.

12         THIS CERTIFICATION IS EXPRESSLY WITHDRAWN AND

13         DENIED UPON THE DISASSEMBLY OR PHOTOCOPYING OF

14         THE FOREGOING TRANSCRIPT OF ANY PART THEREOF,

15         INCLUDING EXHIBITS, UNLESS SAID DISASSEMBLY OR

16         PHOTOCOPYING IS DONE BY THE UNDERSIGNED

17         OFFICIAL COURT REPORTER AND ORIGINAL SIGNATURE

18         AND SEAL IS ATTACHED THERETO.

19         THIS, THE 1ST DAY OF APRIL, 2011.

20

21         *Samantha Engram*

22    ──────────────────────────────

23    SAMANTHA ENGRAM, RPR, CCR-B-2429

      SUPERIOR COURT OF FULTON COUNTY

24    ATLANTA JUDICIAL CIRCUIT

25

                                                        37

## IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | | |
|---|---|---|
| DAN BENSON, | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | CIVIL ACTION FILE |
| v. | § | **1:13-CV-0595-WSD** |
| | § | |
| ANDRES FACEMYER, | § | |
| | § | |
| **Defendant.** | § | |

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on January 9, 2015, I electronically filed the foregoing

**MEMORANDUM IN SUPPORT OF DEFENDANT FACEMYER'S MOTION**

***IN LIMINE*** with the Clerk of Court using the CM/ECF system, which will

automatically send e-mail notification to the following attorneys of record:

Jeffrey R. Filipovits
Filipovits Law Firm, P.C.
2900 Chamblee-Tucker Road
Building 1
Atlanta, GA 30341

*/s/ Veronica L. Hoffler*
**VERONICA L. HOFFLER**
Assistant City Attorney
Georgia Bar No. 358799

***Attorney for Defendant Facemyer***

14