**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

**DAN J. BENSON,**

                              **Plaintiff,**

        **v.**                                                **1:13-cv-595-WSD**

**OFFICER ANDRES FACEMYER,**

                              **Defendant.**

**<u>OPINION AND ORDER</u>**

This matter is before the Court on Defendant Andres Facemyer's

("Defendant") Motion for Judgment as a Matter of Law [61] ("Motion for

Judgment") and Motion to Alter or Amend the Judgment or, in the Alternative, for

a New Trial [62] ("Motion to Amend").  Also before the Court is Plaintiff

Dan J. Benson's ("Plaintiff," and, together with Defendant, the "Parties") First

Motion for Attorney's Fees [60] ("First Motion for Attorney's Fees") and Second

Motion for Attorney's Fees [68] ("Second Motion for Attorney's Fees").

**I.       BACKGROUND**

        A.       <u>Procedural History</u>

        On April 22, 2013, Plaintiff filed his Amended Complaint [4] against

Defendant.[1]  Plaintiff asserted a Fourth Amendment claim under 42 U.S.C. § 1983, arguing that Defendant violated Plaintiff's Fourth Amendment right to be free from "unreasonable searches and seizures" by arresting Plaintiff without probable cause. Plaintiff sued Defendant in his individual capacity.

Defendant arrested Plaintiff for child molestation under O.C.G.A. § 16-6-4,[2] and possession of a firearm during the commission of a felony under O.C.G.A. § 16-11-106,[3] based on an encounter Plaintiff had with a minor child and her mother in Chastain Park, Atlanta, Georgia (the "Park"). (August 21, 2014, Order [23], at 1-2).

On January 8, 2014, Defendant filed his Motion for Summary Judgment [17], on the grounds that he has qualified immunity from the claims asserted in the Amended Complaint.  On January 31, 2014, Plaintiff filed his Motion for Summary Judgment [19], seeking summary judgment that Defendant violated

---

[1]     On February 22, 2013, Plaintiff filed his initial complaint [1], alleging claims against both the City of Atlanta and Defendant.  The Amended Complaint raises a claim against only Defendant, and provides greater factual detail regarding Plaintiff's claim.  Plaintiff voluntarily dismissed [6] the City on April 30, 2013.

[2]     O.C.G.A. § 16-6-4 states: "A person commits the offense of child molestation when such person . . . [d]oes any immoral or indecent act to or in the presence of or with any child under the age of 16 years with the intent to arouse or satisfy the sexual desires of either the child or the person . . . ."  O.C.G.A. § 16-6-4(a)(1).

[3]     Plaintiff's arrest for possession of a firearm during the commission of a felony under O.C.G.A. § 16-11-106 was premised on the actual commission of the felony at issue—child molestation.  (August 21, 2014, Order, at 16 n.14).

Plaintiff's Fourth Amendment right and thus is liable under Section 1983.  The issue raised by the Parties in their respective summary judgment motions center on whether Defendant had arguable probable cause to arrest Plaintiff.

On August 21, 2014, the Court denied [23] the Parties' respective summary judgment motions.[4]  The Court noted that arguable probable cause is evaluated by determining whether "reasonable officers in the same circumstances and possessing the same knowledge as Defendant could have believed that probable cause existed to arrest." (August 21, 2014, Order, at 15).  The Court, in determining whether arguable probable cause to arrest exists, must assess the information known to the arresting officer at the time of arrest, not what the officer learned afterward.  (Id. at 15-16).

The Court concluded, based on the record evidence presented with the summary judgment motions, that it could not determine at what point during the encounter Defendant "arrested" Plaintiff.  (Id. at 19-20).  The Court also concluded this was an issue that was required to be resolved at trial.  (Id. at 20).  The Court noted further that, once the time of arrest was determined, the jury would have to determine what was known to Defendant at the time the arrest occurred.  (Id.).  On

---

[4]     The Court's August 21, 2014, Order, addresses the factual background of this case, as it was understood at the time the summary judgment motions were filed.  Additional facts and evidence were elicited at trial, and are addressed in this Order.

December 22, 2014, the Court set trial for February 2, 2015.  (December 22, 2014, Order [29], at 1).

B.    Trial

Five witnesses were called during the trial: (1) Plaintiff; (2) Defendant;[5] (3) Ms. Lea Benson;[6] (4) Ms. Amy Wood; and (5) Sgt. Scott Ormond.  Because the versions of events differ in significant ways, the Court summarizes each witness's testimony separately.

1.    Plaintiff's Version of the Encounter

Plaintiff testified that, at the time of trial, he was a sixty-nine-year old chiropractor living in Stone Mountain, Georgia.  (Trial Tr. [55-58] at 132:7-12). On February 22, 2011, Plaintiff went to the Park to walk around it for exercise. (Id. at 134:1-13).  After beginning his walk, Plaintiff encountered Ms. Wood and her two-and-a-half-year-old daughter ("Daughter").  (Id. at 137:21-25).  Plaintiff waved at Daughter and Ms. Wood.  (Id. at 138:4-5).  Ms. Wood, who saw Plaintiff wave, told Daughter to "wave at the nice man."  (Id. at 138:4-9).

---

[5]    Defendant testified during Plaintiff's case-in-chief and Defendant's case-in-chief.

[6]    Ms. Lea Benson is Plaintiff's adult daughter.  She testified about the changes in Plaintiff's personality and well-being that resulted from his arrest and confinement.  Ms. Benson's testimony relates to damages only, and is not relevant to the Court's determination of the pending motions.

Daughter was wearing a pink dress and, when Plaintiff was in earshot of them, he said: "That's a beautiful pink dress you have on." (Id. at 138:18-20). Daughter then "grabbed her bodice, yanked it up about a half an inch and yell[ed], Panties." (Id. at 138:21-22). Plaintiff testified that this reminded him of how, when his daughter was that age, she seemed to enjoy wearing matching dresses and underwear. (Id. at 138:23-139:7). Plaintiff responded by saying that his "daughter used to wear panties just like yours." (Id. at 139:13-14). Plaintiff testified that Daughter then said "pee," Ms. Wood picked her up, and they started walking in the opposite direction of each other. (Id. at 139:15-18).

Plaintiff testified that he had walked about a quarter of a mile when he had to rest because of his asthma. (Id. at 140:7-12). Plaintiff turned and walked towards a swing and some benches to sit down. (Id. at 140:14-141:2). After sitting a while, Plaintiff, realized it was 2:45 p.m., and, because he had to drive to Stone Mountain, Georgia, he decided to leave the Park. (Id. at 141:11-15). As Plaintiff was walking towards the parking lot, he saw a police car about fifty (50) yards from where he had his conversation with Ms. Wood. (Id. at 141:19-22). As he was walking, Defendant, a police officer, yelled to him: "You. Hey, you, I want to talk to you. Get over here. Get over here now." (Id. at 142:5-8, 184:10-21). Plaintiff pointed at himself and Defendant said: "You, get over here."

(Id. at 142:9-10).  Defendant further yelled: "Are you armed?  Are you armed?

Are you armed?"  (Id. at 142:12-13).  Plaintiff held up his hands and said "yes,

with a permit," and pointed at his right front pocket.  (Id. at 142:14-15).  Defendant

told Plaintiff to "[g]et over here.  Get over here now."  (Id. at 142:17).  When he

did, Defendant grabbed Plaintiff's right arm and "slung it back around [Plaintiff]."

(Id. at 142:18-19).  Defendant said to Plaintiff "[i]f you run, I am going to chase

you down, I am going to tackle you, and I'm going to really hurt you."  (Id. at

143:1-2).  Defendant told Plaintiff he was being detained, and handcuffed him.

(Id. at 143:3-7, 144:4-5).

　　　　After Plaintiff was handcuffed, Plaintiff testified, as follows, about what

happened and his conversation with Defendant:

> So I don't know what's going on, I'm lost.  And [Defendant] said,
> What did you say to the little girl?  And I said, What little girl?
> [Defendant] said, What did you say to the little girl?  And I said, I
> don't know what little girl you are talking about.  [Defendant] says,
> The little girl that was with her mother.  And I said, Oh, you mean the
> little girl in the pink dress?  [Defendant] said, Yes.  What did you say?
> So I told him just exactly what I told [during his trial testimony].

(Id. at 144:10-20).  Defendant then searched Plaintiff, took his wallet out, asked

him if he was from Stone Mountain, Georgia, and disarmed him.  (Id. at 145:1-3,

19-25, 146:1-7).

Two other officers then approached, and a police wagon arrived.  (Id. at 146:8-10).  Defendant spoke with the other two officers and Defendant then left.  (Id. at 146:12-14).  Plaintiff was questioned by the two arriving officers, and ultimately placed in the police wagon.  (Id. at 146:24-148:8).

Plaintiff was in the police wagon for approximately one hour before Defendant returned to speak with him.  (Id. at 148:10-13).  Defendant stated that, "[a]ccording to the FBI's code on felony child molestation, any adult who uses the word 'panty' in a sentence with a minor under 17 years of age has committed felony child molestation."  (Id. at 148:24-149:2).  Defendant told Plaintiff that he was "going to jail for felony child molestation," and Plaintiff was transported to the police station jail.  (Id. at 149:6-9).  On cross-examination, Plaintiff acknowledged he was driving a borrowed van,[7] but denied there were two encounters at the Park that day.  (Id. at 181:23-182:5).  He testified that Ms. Wood's version of events is different from his and that her version is mistaken.  (Id. at 182:18-20).[8]

---

[7]     Plaintiff testified that on February 22, 2011, he borrowed a friend's white work van because his car needed to be repaired.  (Trial Tr. at 133:10-21).  This is the vehicle Plaintiff had with him at the Park.

[8]     The remainder of Plaintiff's direct and cross-examination testimony relates to events that occurred after his arrest at the Park.  Plaintiff's testimony regarding these post-arrest events is not relevant to the Court's determination of the pending

At no point in his encounter with Defendant was he told he was under "arrest." (Id. at 189:13-15).

2.     <u>Defendant's Version of the Encounter</u> [9]

On February 22, 2011, Defendant responded to a 911 call from the Park. (Id. at 300:22-25). Defendant was told by the 911 operator there was, in the Park, a man in his sixties wearing a black hat with gold letters, blue jeans, and sunglasses who was talking to a little girl about her panties. (Id. at 301:8-13).

When Defendant arrived at the Park, a woman pointed at Plaintiff and said: "[t]here is the man, that's him." [10] (Id. at 210:23-25, 303:21-25). Defendant saw a

---

motions. After Plaintiff finished his direct examination, the Court instructed the jury that:

> Evidence has been presented regarding events that occurred after the arrest of the plaintiff. This evidence may be considered by you only for the limited purpose of determining if the plaintiff suffered an actual injury as a result of the defendant's conduct. And, if he did, you may consider this evidence to determine any damages that plaintiff claims he suffered as a result of the defendant's arrest of him provided that you find the arrest was not lawful. This evidence may not be used by you to determine if the arrest was proper when it occurred. That is a separate determination you must make using evidence regarding what was known to the defendant at the time of the arrest.

(Id. at 165:13-166:2). Defendant did not object to this limiting instruction. (Id. at 168:9). During Plaintiff's testimony, Defendant objected to several questions on the grounds of hearsay or because they were leading. The objections were all sustained by the Court.

[9]     Defendant was called as a witness in Plaintiff's case-in-chief for the purpose of cross-examination, and was called again during Defendant's case-in-chief.

man fitting Plaintiff's description walking along the pedestrian path at the Park. (Id. at 211:1-2, 304:1-3).  Plaintiff was walking away from Defendant.  (Id.). Defendant got out of his police vehicle and called for Plaintiff to come over to him. (Id. at 304:5-7).  As Plaintiff approached, Defendant asked him if he was armed. (Id. at 304:11-13).  Plaintiff stated that he had a pistol in his pocket.  (Id. at 304:15).  Defendant testified that he immediately handcuffed Plaintiff and secured the weapon.  (Id. at 18-22).

Defendant explained to Plaintiff why he stopped him.  (Id. at 305:5-12). Plaintiff told his version of events, stating he had "a conversation with a two-year-old girl and the subject of her panties was brought up."  (Id. at 305:10-17).

After this conversation, Defendant left Plaintiff "secured" with Sgt. Ormond, and went to speak with Ms. Wood.  (Id. at 305:21-306:3).  When Defendant spoke to Ms. Wood, she told him that a man had attempted to say hello to her and her daughter.  (Id. at 201:5-13).  She told Defendant that she felt uncomfortable that Plaintiff had walked up to her and her daughter and tried to start a conversation with Daughter by saying hello.  (Id. at 201:17-202:3).  This was the first encounter

---

[10]     Defendant identified the woman as Ms. Royce Horne, the woman who loaned her cell phone to Ms. Wood to make the 911 call.  (August 21, 2014, Order, at 8).

Ms. Wood claims to have had with Plaintiff that day.  Ms. Wood told Defendant that she encountered Plaintiff a second time.  (Id. at 203:19-21).  During the second encounter, Plaintiff approached Daughter and "made a comment about her dress being pink or pretty.  (Id. at 204:8-11).  "[Daughter] responded saying it was a pretty pink."  (Id. at 204:11-12).  Defendant testified further about the second encounter:

> And then [Ms. Wood] specifically stated that upon hearing this, Mr. Benson then continued to her daughter and said something in regards of, Do your panties match your dress?  This caused her daughter to lift up her dress, show Mr. Benson her panties, and her daughter said, Panties.  This was on the second time Mr. Benson tried to talk to her.

(Id. at 204:13-19).  Ms. Wood did not tell Defendant that Plaintiff attempted to touch Daughter, or expose himself to her, and that Plaintiff stood approximately three feet away from Ms. Wood and Daughter during the interaction.  (Id. at 205:7-14, 206:18-22).  Plaintiff did not attempt to look up Daughter's dress and he did not attempt to follow Ms. Wood or Daughter.  (Id. at 207:22-208:2, 209:4-7).

Defendant testified that it was only after he had "gathered all the facts and all the evidence" that he decided to make an arrest.  (Id. at 306:11-13).  Defendant testified that he spoke with Sgt. Ormond and the two investigators at the scene.

(Id. at 306:21-307:14).[11]  Defendant explained to them the facts of which he was aware, and stated that he believed probable cause existed.  (Id. at 308:3-7).  They agreed.  (Id. at 308:7).

Detective Nixon, an investigator from the sex crimes unit, called the Fulton County District Attorney's Office Crimes Against Women and Children Unit, and spoke with one or more of the assistant district attorneys, who agreed that probable cause existed.  (Id. at 308:8-13).  It was at that point that Defendant decided Plaintiff was, in fact, under arrest and would be charged.  (Id. at 308:16-18).  In deciding whether probable cause existed, Defendant said he looked at the "totality of the circumstances," which included that Ms. Wood had called 911 and believed something, possibly a crime, had occurred, that Plaintiff's statements were similar to Ms. Wood's account, that Plaintiff traveled far from his home to the Park, that he had a borrowed vehicle, was armed, and attempted twice to make contact with Daughter.  (Id. at 309:1-23).

Defendant testified that, under Georgia law, any indecent or immoral act which results "in the sexual gratification of a person or the child basically results in child molestation."  (Id. at 208:14-17).  Defendant testified to his belief that

---

[11]    Plaintiff objected to this testimony, arguing that it was hearsay.  The Court overruled this objection, concluding that the issue in this case was what information Defendant had available to him at the time and whether he acted reasonably.  (Id. at 307:15-20).

"asking about a two-year-old girl's panties is very wrong, very indecent."  (Id. at 208:22-23).  Defendant testified that his basis for believing Plaintiff's question to Daughter was for sexual gratification was because "it is not reasonable for any man to ask any female about her underwear unless he's trying to get some kind of excitement out of it."  (Id. at 208:24-209:3).  Defendant arrested Plaintiff because he asked about Daughter's "panties, which is a clear violation of Georgia law." (Id. at 216:1-3).

### 3.   Ms. Amy Wood

Ms. Wood testified about the two encounters she asserts she had with Plaintiff at the Park.  The first occurred when Ms. Wood was walking with her Daughter along a path at the Park.  (Id. at 258:7-13).  Ms. Wood saw Plaintiff sitting on a bench and, as she approached, Plaintiff said "hello" to Ms. Wood.  (Id. at 258:14-18).  Ms. Wood responded with "hello" and continued on her walk.  (Id. at 258:14-20).

Towards the end of her walk, Ms. Wood sat with Daughter on a set of swings, located near some benches.  (Id. at 260:12-17).  After Ms. Wood sat down, she again saw Plaintiff.  (Id. at 260:17-18).  He was facing away from Ms. Wood and Daughter.  (Id. at 260:18-19).  When Ms. Wood began to leave the area, Plaintiff stood up and began talking to Daughter.  (Id. at 262:16-263:10).

Ms. Wood testified: "[Plaintiff] made a comment, Oh, what a pretty pink dress.  I bet you have panties that match.  And she showed him her panties."  (Id. at 263:21-23).  Ms. Wood said that she was alarmed by this encounter and "picked up [her] daughter, turned [her] back towards [Plaintiff], and walked away."  (Id. at 264:20, 265:1-2).  Ms. Wood was concerned that Plaintiff might follow her home if she left, and she decided she should contact the police.  (Id. at 265:14-17).  Ms. Wood did not have a cell phone with her, and asked another woman, Royce Horne, if she could use hers.  (Id. at 265:3, 265:19-22).  Using it, Ms. Wood called 911.  (Id. at 23).

When asked about what she told the 911 operator, Ms. Wood testified:

[Ms. Wood].  That a man had approached my daughter and I in the park and made inappropriate comments to my daughter, and I gave them a description of what he looked like.
[Counsel].  Did you say what the comments were?
[Ms. Wood].  Yes.
[Counsel].  And what --
[Ms. Wood].  That he had asked her if she had panties that matched her dress.

(Id. at 265:24-266:8).  After calling 911, Ms. Wood went to a youth center at the Park.  (Id. at 266:17-24).  Approximately forty-five (45) minutes later, she was told that the person she described to 911 was being questioned.  (Id. at 267:2-6).  Ms. Wood ultimately spoke with Defendant about the encounters.  (Id. at 267:9-10).

Ms. Wood prepared a written statement for the police that contained as much information as she could remember about what she told the 911 operator.  (Id. at 267:16-21).  In her statement, Ms. Wood stated that, during the first encounter, she "saw [a] man on [the] park swing near the water fountain.  He said hi.  We kept walking and did not respond.  It felt strange.  I didn't want to have [Daughter] swing with him."  (Id. at Def.'s Ex. 3).  Ms. Wood, in her statement, stated about the second encounter that she

> saw [the] same man sitting on park swing on the other side of the park on Lake Forest side.  We sat on a park swing closest to [the] Northside Youth Organization fields.  I could see the man[,] but his back was too [sic] us.  When we finished swinging[,] he got up and said hello to us.  [Daughter] said hi.  The man told my daughter she had a pretty dress on.  She responded and said it was pink.  The man asked her if her panties were pretty and matched her dress.  My daughter placed both of her hands on her panties and said ["]panties pretty[."]
>
> I was very uncomfortable.  I picked up my daughter and carried her towards our parked car in the NYO lot.  I stopped . . . a woman walking to use her phone to call 911.

(Id. at Def.'s Ex. 3).  Ms. Wood gave her statement to Defendant.  (Id. at 268:23-269:5, 271:3-5).  Ms. Wood repeated to Defendant what she had told the 911 operator.  (Id. at 288:1-17).

4.   Sgt. Scott Ormond[12]

Sgt. Ormond is a City of Atlanta police officer.  (Id. at 292:18-24).

Sgt. Ormond, a patrol supervisor, responded to a "child molestation call that came

over the radio" on February 22, 2011.  (Id. at 293:2-14).  When Sgt. Ormond

arrived, Plaintiff was in handcuffs.  (Id. at 293:15-17).  Two other detectives were

at the Park, Barry, a general investigator, and Nixon, an investigator from "Sex

Crimes."  (Id. at 293:23-294-4).  Sgt. Ormond testified that he, Defendant, and the

two investigators discussed what had occurred and decided to charge Plaintiff.  (Id.

at 294:16-295:7).  Sgt. Ormond testified that probable cause to arrest Plaintiff

existed.  (Id. at 296:6-8).

When asked who placed Plaintiff "under arrest," Sgt. Ormond testified that

Defendant "was the officer that encountered [Plaintiff] and placed him in

handcuffs, yes."[13]  (Id. at 298:2-5).

5.   Defendant's Rule 50 Motions

At the conclusion of Plaintiff's case-in-chief, Defendant moved, under Rule

50 of the Federal Rules of Civil Procedure, for judgment as a matter of law.

---

[12]   Sgt. Ormond was called as a witness by Defendant.

[13]   Sgt. Ormond, during direct-examination, testified that a person can, for the
safety of the officer, be detained while an investigation is being conducted.  (Id. at
293:18-20).  Sgt. Ormond did not testify that Plaintiff was handcuffed for an
investigatory purpose.

Defendant argued that Plaintiff's testimony established that Defendant did not "arrest" Plaintiff at the beginning of the police encounter, and that it was only after he was in the police wagon and transported to the police station that he was under arrest.  (Id. at 226:3-24).  Defendant argued that, because the evidence established that he had arguable probable cause to believe a crime had been committed, he was entitled to qualified immunity.  (Id. at 227:10-17, 231:1-8).  Plaintiff, in response to the Court's questions, argued that Defendant's decision to arrest Plaintiff was not reasonable based on the facts he knew at the scene, and that arguable probable cause did not exist.  (Id. at 235:13-236:17).  The Court reserved on Defendant's motion.

At the close of Defendant's case-in-chief, Defendant renewed his Rule 50 motion for judgment as a matter of law.  (Id. at 320:2-3).  The Court granted Defendant's motion on Plaintiff's claim for punitive damages, finding that there was not sufficient evidence to support a jury finding that Plaintiff's arrest was motivated by an evil motive or intent, or done recklessly or with callous indifference to Plaintiff's federally-protected rights.  (Id. at 330:6-14).  The Court, declining to rule on the renewed motion, allowed the issue of liability and

compensatory damages to go to the jury.[14]

6. <u>Jury Charges and Questions</u>

The Court held a charge conference with counsel for the Parties. After closing arguments, the Court charged the jury. (<u>Id.</u> at 365:3-385-21). The charges included instructions on probable cause, Georgia law on child molestation, and compensatory and nominal damages.

The Court instructed the jury, in pertinent part, as follows:

> It is an offense for any person to commit the crime of child molestation, which is defined as any immoral or indecent act to, or in the presence of, or with any child under the age of 16 with the intent to arouse or satisfy the sexual desires of either the child or the person. Child molestation is a felony.
>
> . . .
>
> It is also a criminal offense for any person to commit the crime of possession of a firearm during the commission of a felony when such person has a firearm during the commission of any felony against or involving the person of another.
>
> . . .

---

[14]    The Eleventh Circuit has noted that, in all but the plainest cases, there are cogent reasons of judicial economy to submit cases to jury verdict subject to reserved rulings on motions for judgment as a matter of law, primarily to avoid the need for a new trial should the district court erroneously grant the motion and be reversed by the appellate court. <u>Therrell v. Georgia Marble Holdings Corp.</u>, 960 F.2d 1555, 1569 (11th Cir. 1992) (citing 9 Charles A. Wright & Arthur R. Miller, Federal Practice and Procedure § 2533, at 586 (1971)).

A seizure under the Fourth Amendment occurs when the officer by means of physical force or a show of authority terminates or restrains a person's freedom of movement through means intentionally applied.

A seizure, however, is not necessarily an arrest. Law enforcement officers may seize a suspect for a brief investigatory stop where, one, the officers have a reasonable suspicion that the suspect was involved in or is about to be involved in criminal activity, and, two, the stop was reasonably related in scope to the circumstances which justify the interference in the first place.

In determining at what point Mr. Benson was arrested, you should note that the particular use -- I'm sorry, in determining at what point Mr. Benson was arrested, you should note that the use of a particular method to restrain a person's freedom of movement does not necessarily turn a seizure into an arrest.

Police officers are entitled to take reasonable actions based upon the circumstances to protect themselves or maintain the status quo. The fact that a police officer handcuffs a suspect and places them into a police car does not as a matter of course transform an investigatory stop into an arrest. Further, a detention of an hour does not in and of itself transform an investigatory stop into an arrest.

An investigatory stop is not an arrest despite the fact that a reasonable person would not believe he was free to leave. No bright-line test separates an investigatory stop from an arrest. Instead whether a seizure has become too intrusive to be an investigatory stop and must be considered an arrest depends upon the degree of intrusion considering all the circumstances.

Whether a seizure constitutes an arrest depends upon the law enforcement purpose served by the seizure, the diligence with which they pursue their investigation, the scope and intrusiveness of the intrusion, and the duration of the detention.

(Id. at 373:11-21, 377-24-379:10). Neither Party objected to the Court's

jury charges as proposed at the charge conference or as given.  (Id. at 332:19-340:8, 385:24-386:1).  The Court recessed to allow the jury to deliberate.

The Court later reconvened to address several questions asked by the jury.  The jury first asked the Court to "[p]lease provide again the Georgia Code 6-4 definition of child molestation" and they asked how "does the law define an immoral or indecent act."  (Id. at 388:10-14).  The Court told the Parties it intended to reread the instructions on the child molestation statute.  (Id. at 388:15-20).  Neither Party objected to rereading these portions of the instructions.  (Id. at 389:6-7).

The jury next asked: (1) "Is it illegal to say the word 'panties' to a minor," and (2) "at what time was Dr. Benson actually placed under arrest."  (Id. at 389:15-18).  The Court stated it intended to instruct the jury that they had to answer these questions themselves but that the Court would reinstruct the jury on the difference between seizure and arrest.  (Id. at 389:19-390:3).  Neither Party objected to answering the questions in this way, and neither Party objected to the statement and instructions as given by the Court to the jury.  (Id. at 390:5-6, 394:9-11).

The Court later reconvened to address a further question.  In it the jury asked if the Court could define the word "intentionally."  (Id. at 395:10-12).  The Court advised the Parties it intended to send a written response to the question which stated:

> Members of the jury, the instructions you have been given explain the law regarding the claim over which you are deliberating, and you should consider the instructions and the words within them according to your common experience and understanding.

(Id. at 395:13-21).  Neither Party objected to this written response and it was delivered to the jury.  (Id. at 395:22-23).

The Court reconvened the Parties to address a note the jury sent to the Court that stated "[w]e are having extreme difficulty reaching a unanimous decision.  (Id. at 396:10-12).  Because it was late in the afternoon, the Court stated it intended to dismiss the jury for the day.  (Id. at 396:12-17).  Neither Party objected to this decision and the jury was instructed to return the following day to continue their deliberations.  (Id. at 396:19-20).

The jury continued their deliberations on February 5, 2015.  The Court reconvened to address a note from the jury that stated that they have been unable to reach a unanimous decision.  (Id. at 402:9-12).  In response, the Court advised the Parties it intended to read a civil Allen charge to the jury.  (Id. at 402:17-20).  Neither Party objected to this response.  (Id. at 402:21-23).  The Court read the

Allen charge to the jury and instructed them to continue their deliberations.  (Id. at 403:2-405:5).

The Court reconvened the Parties again to address a further question from the jury.  The jury asked: "[c]an we award general terms such as attorneys' fees for nominal damages, or do we have to decide on a specific amount."  (Id. at 406:6-9).  The Court stated it intended to respond by sending the jury another note that said "[i]f nominal damages are awarded, you should enter a specific amount of nominal damages."  (Id. at 406:10-12).  Neither Party objected to the note response and it was delivered to the jury.  (Id. at 406:13-15).

7.  Verdict

The jury ultimately reached their unanimous verdict.  They found that Plaintiff had proved by a preponderance of the evidence that Defendant intentionally violated Plaintiff's rights by arresting him without probable cause, and that this arrest caused injury to Plaintiff.  (Id. at 408:13-19).  The jury found that Plaintiff was entitled to compensatory damages in the amount of $472,000.  (Id. at 408:20-25).  The jury did not award nominal damages.  (Id. at 409:6-8).  The jury was polled, and each juror confirmed that the verdict as published was the same verdict they reached in the jury room, and that the verdict was freely and voluntarily entered into by them.  (Id. at 409:11-412:16).  On February 6, 2015, the

21

Court entered judgment in favor of Plaintiff and against Defendant in the amount

of $472,000.  (Id. at 412:21-23).

C.    Pending Motions[15]

On February 18, 2015, Defendant filed his timely Motion for Judgment

under Rule 50 of the Federal Rules of Civil Procedure, arguing that Defendant is

entitled to judgment as a matter of law because Defendant had arguable probable

cause to arrest Plaintiff based on the "totality of the circumstances."  (Def. Mot. for

Judgment at 14, 16).  Defendant argues that Plaintiff was merely detained for an

hour while Defendant investigated the incident reported, and that this detention did

not "ripen into an arrest" until the investigation was completed and he was

transported to the police station.[16]  (Reply [64] in Support of Mot. for Judgment at

---

[15]    On February 17, 2015, Plaintiff filed his First Motion for Attorney's Fees.
Plaintiff stated that he has incurred approximately $70,000 in attorney's fees
litigating this case, and that he would provide a detailed itemization within thirty
(30) days.  On March 19, 2015, Plaintiff filed a Second Motion for Attorney's Fees
[68], requesting an award of $74,910 in attorney's fees to Mr. Filipovits and
$6,630 to Mr. Yates.  Plaintiff stated that, because this matter is ongoing, Plaintiff
would supplement this second motion to the extent that his attorneys incur
additional time for which compensation is appropriate under 42 U.S.C. § 1988.
Because Plaintiff has filed a superseding motion for attorneys' fees, the Court will
deny his First Motion for Attorney's Fees as moot.  The Court also denies
Plaintiff's Second Motion for Attorney's Fees but allows Plaintiff to refile his
attorneys' fees motion within thirty (30) days of the conclusion of the litigation in
this Court.
[16]    Defendant limits his Motion for Judgment to his defense of qualified
immunity.  Defendant raised his defense of qualified immunity when he moved the

6-7).

On February 27, 2015, Defendant filed his timely Motion to Alter under Rule 59(a) and (e) of the Federal Rules of Civil Procedure.  Defendant argues, based on the questions raised by the jury during their deliberations, that the jury was confused about their role and what they were required to find in reaching a verdict.  (Mot. to Alter at 14-15).  Defendant argues that the jury appears to have been focused on whether Plaintiff was guilty beyond a reasonable doubt of child molestation, rather than focusing on whether Defendant had probable cause to arrest Plaintiff.  (Id. at 15).  Defendant argues, based on their question about nominal damages, that the jury was also confused about how to assess Plaintiff's damages.  (Id. at 16).  Defendant argues that the jury's verdict is not supported by the weight of the evidence.  (Id. at 21-25).  Defendant argues, in the alternative, that he is entitled to a new trial because of the jury's confusion.  (Id. at 25-29).  Defendant argues also that the jury's verdict was the result of jury nullification, caused by Plaintiff's request in his closing argument that the jurors ignore "what

---

Court for judgment as a matter of law at the conclusion of Plaintiff's case-in-chief and the close of evidence.  Because Defendant has renewed his motion, this Order addresses whether Defendant is entitled to judgment as a matter of law based on qualified immunity.  Plaintiff does not argue that Defendant cannot raise his qualified immunity argument in the pending Rule 50 motion.

Officer Facemyer thought or [] what the other police officers on the scene thought"

when assessing what a reasonable police officer would have done.  (<u>Id.</u> at 29-30).

## II.   DISCUSSION

    A.   <u>Legal Standard for Motion for Judgment</u>

Rule 50(a) of the Federal Rules of Civil Procedure provides:

> If a party has been fully heard on an issue during a jury trial and the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue, the court may:
> (A) resolve the issue against the party; and
> (B) grant a motion for judgment as a matter of law against the party on a claim or defense that, under the controlling law, can be maintained or defeated only with a favorable finding on that issue.

Fed. R. Civ. P. 50(a)(1).  "If the court does not grant a motion for judgment as a

matter of law made under Rule 50(a), the court is considered to have submitted the

action to the jury subject to the court's later deciding the legal questions raised by

the motion."  Fed. R. Civ. P. 50(b).

    To grant a motion under Rule 50, the Court must find "'there is no legally

sufficient evidentiary basis for a reasonable jury to find' for the non-moving

party."  <u>Chaney v. City of Orlando</u>, 483 F.3d 1221, 1227 (11th Cir. 2007) (quoting

<u>Lipphardt v. Durango Steakhouse of Brandon, Inc.</u>, 267 F.3d 1183, 1186 (11th Cir.

2001)).  In considering a Rule 50 motion, the Court focuses on the sufficiency of

the evidence.  <u>Id.</u>  The Court must "review all of the evidence in the record and

must draw all reasonable inferences in favor of the nonmoving party."

Cleveland v. Home Shopping Network, Inc., 369 F.3d 1189, 1192–93 (11th Cir.

2004).  Credibility determinations, the drawing of inferences, and the weighing of

competing evidence are functions for the jury, not the Court.  Id. at 1193.

Where the case has been submitted to the jury, the Court must deny the

motion and affirm the jury verdict "unless there is no legal basis upon which the

jury could have found for [the prevailing party]."  Nebula Glass Int'l,

Inc. v. Reichhold, Inc., 454 F.3d 1203, 1210 (11th Cir. 2006).

B.     Legal Standard for Motion to Alter

A motion under Rule 59(e), which permits a party to move for relief from a

judgment, is granted only under certain limited circumstances.  "[T]here are three

primary grounds for reconsideration of a judgment: an intervening change in

controlling law, the availability of new evidence, or the need to correct clear error

or prevent manifest injustice."  United States v. Battle, 272 F. Supp. 2d 1354, 1357

(N.D. Ga. 2003).  The decision whether or not to grant a Rule 59(e) motion is

"committed to the sound discretion of the district judge."  Am. Home Assurance

Co. v. Glenn Estess & Assocs., 763 F.2d 1237, 1238-39 (11th Cir. 1985).

Rule 59(a)(1) of the Federal Rules of Civil Procedure provides:

The Court may, on motion, grant a new trial on all or some of the
issues—and to any party—as follows:  (A) after a jury trial, for any

> reason for which a new trial has heretofore been granted in an action at law in federal court; or (B) after a nonjury trial, for any reason for which a rehearing has heretofore been granted in a suit in equity in federal court.

Fed. R. Civ. P. 59(a)(1).  Generally, a motion for a new trial may be granted where "the verdict is against the weight of the evidence, . . . the damages are excessive, or . . . for other reasons, the trial was not fair to the moving party; and may raise questions of law arising out of alleged substantial errors in admission or rejection of evidence or instructions to the jury." Montgomery Ward & Co. v. Duncan, 311 U.S. 243, 251 (1940).

C.  Analysis: Motion for Judgment as a Matter of Law

Defendant argues that he is entitled to judgment notwithstanding the verdict because the evidence established at trial proves that he is entitled to qualified immunity.

1.  Qualified Immunity

If a law enforcement officer makes an arrest without probable cause, he may still retain the defense of qualified immunity.  "Qualified immunity offers complete protection for government officials sued in their individual capacities if their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Wood v. Kesler, 323 F.3d 872, 877 (11th Cir. 2003) (citations and quotations omitted).  To be eligible for

26

qualified immunity, the official must first establish that he was performing a

"discretionary function" at the time the alleged violation of federal law occurred.

Crosby v. Monroe, 394 F.3d 1328, 1332 (11th Cir. 2004).[17]  Once the official has

established that he was engaged in a discretionary function, the plaintiff bears the

burden of demonstrating that the official is not entitled to qualified immunity.  Id.

To demonstrate that the official is not entitled to qualified immunity, a plaintiff

must show two things: (1) that the defendant has committed a constitutional

violation and (2) that the constitutional right the defendant violated was "clearly

established" at the time he did it.[18]  Id.

    The standard to determine if an arrest constitutionally violates a person's

rights sufficient to support a claim under § 1983 is whether there was "arguable

probable cause" to make the arrest.[19]  Lee v. Ferraro, 284 F.3d 1188, 1195 (11th

Cir. 2002).  Arguable probable cause is evaluated by determining whether

"reasonable officers in the same circumstances and possessing the same knowledge

---

[17]     The Parties do not dispute that Defendant was performing a "discretionary function" when he arrested Plaintiff on February 22, 2011.

[18]     The Fourth Amendment's requirement that a warrantless arrest must be made with probable cause is clearly established.  Kingsland v. City of Miami, 382 F.3d 1220, 1226 (11th Cir. 2004); Marx v. Gumbinner, 905 F.2d 1503, 1505 (11th Cir. 1990).

[19]     At the Preliminary Hearing, Judge Woodson concluded that Defendant did not have probable cause to arrest Plaintiff.  (August 21, 2014, Order, at 9).  The standard to determine if Defendant is entitled to qualified immunity from the claim is the lower arguable probable cause standard.

as the Defendant[] could have believed that probable cause existed to arrest."  Id.

"What counts for qualified immunity purposes relating to probable cause to arrest

is the information known to the defendant officers or officials at the time of their

conduct, not the facts known to the plaintiff then or those known to a court later."

Jones v. Cannon, 174 F.3d 1271, 1283 n.4 (11th Cir. 1999); see also

Brienza v. Gee, 307 F. App'x 352, 354 (11th Cir. 2009); Skop v. City of Atlanta,

Georgia, 485 F.3d 1130, 1143 (11th Cir. 2007).

Where a case is fully tried and the defendant did not request special

interrogatories, the court must "resolve all disputed factual issues for the question

of qualified immunity by viewing the evidence in the light most favorable to

Plaintiff."  Priester v. City of Riviera Beach, Fla., 208 F.3d 919, 926 (11th Cir.

2000).

To determine whether a reasonable police officer, knowing what Defendant

knew at the time of arrest, would have reasonably believed that probable cause

existed to arrest Plaintiff, the Court must determine when during the police

encounter Defendant arrested Plaintiff.

### 2.   Time of Plaintiff's Arrest

Plaintiff contends that Defendant arrested Plaintiff before he interviewed

Ms. Wood, by placing Plaintiff in handcuffs, searching his personal effects,

threatening to tackle and hurt him if he tried to leave the scene, and interrogating him.  (Pl.'s Res. [63] to Mot. for Judgment at 20).  Defendant contends that he did not arrest Plaintiff until after he interviewed Ms. Wood and consulted with Sgt. Ormond and the other two investigators.  (Reply [64] in Support of Mot. for Judgment at 5).  In other words, Defendant contends that Plaintiff was not arrested until Defendant informed him that he was being charged with child molestation, and had Plaintiff transported to the police station jail.

"A 'seizure' under the Fourth Amendment occurs 'when the officer, by means of physical force or show of authority, terminates or restrains [a person's] freedom of movement, through means intentionally applied.'"  Chandler v. Sec'y of Florida Dep't of Transp., 695 F.3d 1194, 1199 (11th Cir. 2012) (citing Brendlin v. California, 551 U.S. 249, 254 (2007)); see also Proescher v. Bell, 966 F. Supp. 2d 1350, 1363 (N.D. Ga. 2013).  A threat to injure Plaintiff if he fled, and handcuffing of Plaintiff, if true, can constitute a seizure of Plaintiff for Fourth Amendment purposes.  See Chandler 695 F.3d at 1199.

A "seizure," however, is not necessarily an "arrest."  "[L]aw enforcement officers may seize a suspect for a brief, investigatory . . . stop where (1) the officers have a reasonable suspicion that the suspect was involved in, or is about to be involved in, criminal activity, and (2) the stop 'was reasonably related in scope

to the circumstances which justified the interference in the first place.'"

United States v. Jordan, 635 F.3d 1181, 1186 (11th Cir. 2011) (citing

Terry v. Ohio, 392 U.S. 1, 19-20 (1968)).

An "investigatory stop is not an arrest despite the fact that a reasonable person would not believe he was free to leave."  United States v. Blackman, 66 F.3d 1572, 1576 (11th Cir. 1995).  "No brightline test separates an investigatory stop from an arrest.  Instead, whether a seizure has become too intrusive to be an investigatory stop and must be considered an arrest depends on the degree of intrusion, considering all the circumstances."  Id.  "[T]he fact that police handcuff the person or draw their weapons does not, as a matter of course, transform an investigatory stop into an arrest."  Id.; see also United States v. Gil, 204 F.3d 1347, 1350 (11th Cir. 2000) (detainment of handcuffed defendant in back of police car for 75 minutes a Terry stop and not an arrest).

The Court must look at the "totality of the circumstances" to determine if an investigatory stop has ripened into a full scale arrest.  Gil, 204 F.3d at 1351.  The Court considers several factors, "including the law enforcement purposes served by the detention, the diligence with which the police pursue the investigation, the scope and intrusiveness of the detention, and the duration of the detention."  Id. (quoting United States v. Hardy, 855 F.2d 753, 759 (11th Cir. 1988)).

Defendant testified that he was told by the 911 operator there was a man in his sixties wearing a black hat with gold letters, blue jeans, and sunglasses in the Park talking to a little girl about her panties.  (Trial Tr. at 301:8-13).  When he arrived at the Park, he spoke with a woman who pointed at Plaintiff and said "[t]here is the man, that's him."  (Id. at 210:23-25, 303:21-25).  Defendant saw a man fitting Plaintiff's description walking away from Defendant along the pedestrian path at the Park.  (Id. at 211:1-2, 304:1-3).  Defendant got out of his police vehicle and called out for Plaintiff to come over to him.  (Id. at 304:5-7).

Plaintiff testified that Defendant, during their initial encounter, yelled to him: "You.  Hey, you, I want to talk to you.  Get over here.  Get over here now." (Id. at 142:5-8, 184:10-21).  As Plaintiff approached, Defendant yelled: "Are you armed?  Are you armed?  Are you armed?"  (Id. at 142:12-13).  Plaintiff held up his hands and said "yes, with a permit," and pointed at his right front pocket.  (Id. at 142:14-15).  Defendant told Plaintiff to "[g]et over here.  Get over here now." (Id. at 142:17).  When he did, Defendant grabbed Plaintiff's right arm and "slung it back around [Plaintiff]."  (Id. at 142:18-19).  Defendant said to Plaintiff "[i]f you run, I am going to chase you down, I am going to tackle you, and I'm going to really hurt you."  (Id. at 143:1-2).  Defendant told Plaintiff he was being detained, and handcuffed him.  (Id. at 143:3-7, 144:4-5).  After Plaintiff was told that he

would be hurt if he ran, Defendant interrogated Plaintiff and disarmed him.[20]  (Id.

at 144:10-20, 145:1-3, 19-25, 146:1-7).  Plaintiff, when questioned about

Daughter, told Defendant (id. at 144:20), that Daughter was wearing a pink dress,

and Plaintiff said: "That's a beautiful pink dress you have on."  (Id. at 138:18-20).

Daughter then "grabbed her bodice, yanked it up about a half an inch and yell[ed],

Panties."  (Id. at 138:21-22).  Plaintiff responded by saying that his "daughter used

to wear panties just like yours."  (Id. at 139:13-14).[21]  Plaintiff was then

interrogated by two other police officers and placed in a police wagon for

approximately one hour.  (Id. at 146:24-148:13).

    As our Circuit has noted, there is no "brightline test [that] separates an

investigatory stop from an arrest."  Blackman, 66 F.3d at 1576.  The Court,

---

[20]    Defendant's version of what occurred after he got out of his vehicle is
different from Plaintiff's version.  Defendant stated that he called out to Plaintiff to
come over to him and asked if he was armed.  (Id. at 304:5-7, 304:11-13).
Defendant testified that he immediately handcuffed Plaintiff, secured the weapon,
and then explained why he had stopped him.  (Id. at 304:15, 18-22, 305:5-12).
Plaintiff then told his version of events.  (Id. at 305:11-12).  Plaintiff's version of
this initial encounter is more aggressive and accusatory than Defendant's version.
The Court, however, on a motion under Rule 50 of the Federal Rules of Civil
Procedure, must "review all of the evidence in the record" and "draw all
reasonable inferences" in favor of Plaintiff—the non-moving party.  See
Cleveland, 369 F.3d at 1192-93.  Credibility determinations, the drawing of
inferences, and the weighing of competing evidence are functions for the jury, not
the Court.  Id. at 1193.
[21]    This, Plaintiff claims, reminded him of how, when his daughter was that age,
she seemed to enjoy wearing matching dresses and underwear.  (Trial Tr. at
138:23-139:7).

viewing the evidence in favor of Plaintiff, the non-moving party, considers the factors discussed in Gil to determine if Defendant's initial investigatory stop ripened into an arrest before he spoke with Ms. Wood and the other officers.  In considering the law enforcement purpose served by the detention, the most important aspect "is whether the police detained [the individual] to pursue a method of investigation that was likely to confirm or dispel their suspicions quickly, and with a minimum of interference."  Gil, 204 F.3d at 1351 (quoting Hardy, 855 F.2d at 759).

Defendant knew, based on the 911 call and Plaintiff's statement, that the incident with Daughter was a non-violent one and he knew Plaintiff's name and address.  Grabbing Plaintiff's right arm and pulling it behind him, threatening a sixty-five-year-old man with violence should he attempt to run, handcuffing him after he was disarmed, and continuing to detain him while Defendant investigated a non-exigent matter was not the minimal amount of interference Defendant could have applied to complete his investigation.  See id.  In Gil, the defendant was handcuffed and placed in a police car for over an hour.  Id.  This detention was, under the facts of that case, necessary to prevent the defendant from jeopardizing an investigation by the police officers into her residence by interfering with it.  Id. That is not the case here where there is no evidence Plaintiff could interfere with or

otherwise jeopardize the investigation Defendant and the other officers present would conduct.  The only other evidence Defendant sought in determining what occurred was Ms. Wood's statement, which Defendant could have obtained whether Plaintiff was present or not.  The first factor, thus, suggests that Plaintiff's detention ripened into an arrest before Defendant talked with Ms. Wood.

The record evidence supports that Defendant did not detain Plaintiff for an overly long time or beyond the time that was necessary for him to complete his investigation.  Plaintiff was interrogated by Defendant and the other two officers, and then held in the police wagon for approximately an hour.  Defendant appears to have held Plaintiff only as long as was needed for him to interview Ms. Wood and discuss with the other officers the facts of the case to decide if charges should be pressed.

The scope of the intrusiveness of the detention weighs in favor of concluding that the arrest occurred earlier in the police encounter.  In Gil, the Eleventh Circuit noted that being handcuffed and placed in the back of a police car was a "severe form of intrusion . . . ."  Id.  The Court in Gil concluded, in that case, that the intrusion was necessary because the defendant, a woman, could not be searched at the scene because a female officer was not available to conduct the search.  Id.  Here, Defendant, at the start of the encounter, disarmed Plaintiff, and

34

the record does not show that handcuffing Plaintiff and detaining him in the back of a police wagon, a "severe form of intrusion," was necessary for officer safety or for Defendant to complete his investigation.

The time of the arrest was the issue upon which the Court denied summary judgment in this case, noting that it needed to be resolved at trial. (August 21, 2014, Order, at 19-20).[22]  Plaintiff, in support of his motion for summary judgment and in opposition to Defendant's motion for summary judgment, asserted the same facts as the ones discussed here regarding his initial encounter with Defendant.  "When the evidence produced at trial mirrors the evidence presented on summary judgment, 'the same evidentiary dispute that got the plaintiff past a summary judgment motion asserting the qualified immunity defense will usually get that plaintiff past a Rule 50(a) motion asserting the defense, although the district court is free to change its mind.'"  Bennett v. Hendrix, 325 F. App'x 727, 736 (11th Cir. 2009) (quoting Johnson v. Breeden, 280 F.3d 1308, 1317–18 (11th Cir. 2002)).

---

[22]     The Eleventh Circuit has repeatedly stressed that the "facts" accepted at the summary judgment state of the proceedings may not be the "facts" established at trial.  Priester, 208 F.3d at 926 n.3.  The Court's previous opinion on the time of arrest being a significant unresolved issue at the summary judgment stage is, nevertheless, instructive in this case.

At trial, the Court gave detailed instructions to the jury on the law of seizure and arrest, to which neither Party objected.  (Trial Tr. at 377:24-379:10, 385:24-386:1).  Where, as here, the case was fully tried and Defendant did not request special interrogatories, the Court must "resolve all disputed factual issues for the question of qualified immunity by viewing the evidence in the light most favorable to Plaintiff."  Priester, 208 F.3d at 926 n.3;[23] Wilkerson v. Seymour, No. 15-11226, 2015 WL 5254856, at *2 (11th Cir. Sept. 10, 2015) (citing Priester); see also Iacobucci v. Boulter, 193 F.3d 14, 23 (1st Cir. 1999) ("When a qualified

---

[23]   In Priester, the Eleventh Circuit considered an appeal chiefly about qualified immunity and the deference due the implicit fact findings contained in a jury verdict.  Priester, 208 F.3d at 922.  The plaintiff in Priester was bitten by a police dog and brought suit for excessive force against two police officers, Wheeler and Cushing.  Id. at 922-23.  The jury returned a verdict in favor of the plaintiff, and the defendants moved for judgment as a matter of law and, in the alternative, for a new trial.  Id. at 923.  The district court denied the defendants' motion for a new trial, denied Wheeler's motion for judgment as a matter of law, and granted Cushing's motion for judgment as a matter of law.  Id.  The Priester Court noted that, in reaching the conclusion that Cushing was entitled to judgment as a matter of law, the district court "mistakenly relied upon [the defendants'] version of the facts, rather than [the plaintiff's] version of the facts, as it was required to do."  Id. at 925.  The Priester Court concluded that, based on the plaintiff's version of events, the grant of judgment as a matter of law for Cushing was error.  Id.

The Priester Court also addressed the defendants' assertion of qualified immunity.  The Priester Court noted that when the Eleventh Circuit "review[s] a district court's denial of a defendant's motion for summary judgment on qualified immunity grounds, we take the 'facts' in the light most favorable to the plaintiff."  Id. at 926 n.3.  The Priester Court concluded that, after "defer[ring] to the jury's implicit fact finding," the defendants were not entitled to judgment as a matter of law on the grounds of qualified immunity.  Id. at 927-28.  In Priester, there was not alternative times when the alleged excessive force occurred.

immunity defense is pressed after a jury verdict, the evidence must be construed in the light most hospitable to the party that prevailed at trial."); <u>Frazell v. Flanigan</u>, 102 F.3d 877, 886 (7th Cir. 1996) (court bound by jury's determination of disputed facts); <u>Acosta v. City and County of San Francisco</u>, 83 F.3d 1143, 1147 (9th Cir. 1996) (court bound by jury's implicit fact findings as discernible from verdict).

Having concluded that Plaintiff's detainment was a "severe form of intrusion" that was not the minimal amount of interference Defendant could have applied to complete his investigation, the Court concludes that Defendant arrested Plaintiff during their initial encounter. This was before Defendant spoke with Ms. Wood or the other officers. This conclusion is supported by the jury's implicit fact findings[24] in the absence of special interrogatories[25] and the Court's obligation to review the record evidence in favor of the non-moving party. <u>See</u> <u>Priester</u>, 208 F.3d at 926 n.3; <u>Cleveland</u>, 369 F.3d at 1192-93. The Court now evaluates

---

[24]    Defendant testified that it was only after he had "gathered all the facts and all the evidence" that he decided to make an arrest. (Trial Tr. at 306:11-13). The jury was entitled to disregard this testimony and decide, based on their determination of the facts, the arrest had occurred during the initial police encounter.

[25]    Plaintiff asserts that Defendant, by failing to request special interrogatories on the issue of the time of the arrest, waived his right to assert qualified immunity. Plaintiff acknowledges that the Eleventh Circuit has not reached such a holding. The Court declines to reach such a holding here and instead will construe, as required by the Eleventh Circuit's case authority, the facts established at trial in favor of Plaintiff.

what Defendant knew at the time of arrest and whether, at that time, arguable probable cause existed.

3.    <u>Defendant's Knowledge and Arguable Probable Cause</u>

Arguable probable cause is evaluated by determining whether a reasonable officer, possessing the same knowledge as the arresting officer at the time of the arrest, would have believed probable cause to exist.  <u>See</u> <u>Lee</u>, 284 F.3d at 1195; <u>Jones</u>, 174 F.3d at 1283 n.4; <u>Brienza</u>, 307 F. App'x at 354; <u>Skop</u>, 485 F.3d at 1143.

Defendant, at the time of arrest, knew that a 911 caller had reported that a man in his sixties, wearing a black hat with gold letters, blue jeans, and sunglasses, was in the Park talking to a little girl about her panties.  (Trial Tr. at 301:8-13). Defendant also knew that Plaintiff was a sixty-five-year-old man visiting the Park from Stone Mountain, Georgia, and that Daughter was wearing a pink dress, and that Plaintiff had said to Daughter: "That's a beautiful pink dress you have on." (<u>Id.</u> at 138:18-20, 145:2-4).  Defendant knew that Daughter then "grabbed her bodice, yanked it up about a half an inch and yell[ed], Panties."  (<u>Id.</u> at 138:21-22). Defendant knew that Plaintiff responded by saying that his "daughter used to wear panties just like yours."  (<u>Id.</u> at 139:13-14).  Defendant knew that Plaintiff carried a pistol for which he had a permit.  (<u>Id.</u> at 145:5-6).

The Court evaluates whether a reasonable police officer, knowing the above-referenced facts, would have believed that there was probable cause to arrest Plaintiff.  See Lee, 284 F.3d at 1195.  The only relevant offense for which Plaintiff was charged was child molestation under O.C.G.A. § 16-6-4. [26]  The Court, thus, evaluates whether a reasonable police officer would have believed that probable cause existed to arrest Plaintiff for child molestation.

O.C.G.A. § 16-6-4 states: "A person commits the offense of child molestation when such person . . . [d]oes any immoral or indecent act to or in the presence of or with any child under the age of 16 years with the intent to arouse or satisfy the sexual desires of either the child or the person . . . ."  O.C.G.A. § 16-6-4(a)(1).  The "immoral or indecent" acts proscribed by O.C.G.A. § 16-6-4 are those that "offend against the public's sense of propriety" as well as "acts more suggestive of sexually oriented misconduct to a child's body than simply assaultive in nature."  Chapman v. State, 318 S.E.2d 213, 214 (Ga. App. Ct. 1984).  "The focus is on the adult's action toward the child in relation to the motive for the action[.]"  Stroeining v. State, 486 S.E.2d 670, 671 (Ga. App. Ct. 1997).  An "act

---

[26]     Plaintiff was also charged with possession of a firearm during the commission of a felony under O.C.G.A. § 16-11-106.  This offense is premised on the actual commission of the felony at issue—child molestation—and the validity of this arrest must stand or fall in conjunction with the underlying felony upon which the arrest was based.  Cf. State v. Ray, 510 S.E.2d 361, 361 (Ga. App. Ct. 1998).

generally viewed as morally and sexually indelicate, improper and offensive" can constitute child molestation.  Chapman, 318 S.E.2d at 215.  There is no requirement that the act must involve physical contact with the child.  "A child's mind may be victimized by molestation as well."  Smith v. State, 342 S.E.2d 769, 771 (Ga. App. Ct. 1986).

A reasonable police officer, knowing only what Defendant knew at the time he arrested Plaintiff, would not have believed probable cause existed to arrest Plaintiff for child molestation.[27]  At the time of arrest, Defendant knew only that Plaintiff had, according to Plaintiff, a brief conversation with a child, whose mother, the 911 caller, was present, where the child's underwear was mentioned. A reasonable police officer would not have believed, without further investigation, that Plaintiff's conversation with Daughter was "sexually oriented misconduct" or conduct that "offend[ed] . . . the public's sense of propriety" done with the intent to arouse his or the child's sexual desires, such that probable cause to arrest existed.  See O.C.G.A. § 16-6-4(a)(1); Chapman, 318 S.E.2d at 214.  This

---

[27]     The Court notes that Sgt. Ormond and the two investigators, after discussing Ms. Wood's statement, agreed that probable cause existed.  (Trial Tr. at 308:3-7). Even if true, this assessment would only be relevant if the arrest had not yet occurred.  If the arrest occurred before Defendant spoke with Ms. Wood, the other officers had the benefit of additional information not available to Defendant when he arrested Plaintiff.  Their opinions about the existence of probable cause after the arrest are not relevant.

assessment of what a reasonable police officer would have concluded is supported by the jury's implicit fact findings in the absence of special interrogatories and the Court's obligation to resolve all factual disputes on the question of qualified immunity by viewing the evidence in the light most favorable to Plaintiff.  See Priester, 208 F.3d at 926 n.3; Cleveland, 369 F.3d at 1192-93.  Having concluded that Defendant did not have arguable probable cause to arrest Plaintiff, the Court concludes that Defendant is not entitled to qualified immunity for the arrest that occurred at the time Plaintiff was detained and handcuffed.

The Court must "affirm the jury verdict unless there is no legal basis upon which the jury could have found for [the prevailing party]."  Telecom Technical Servs. Inc. v. Rolm Co., 388 F.3d 820, 830 (11th Cir. 2004); Carter v. City of Miami, 870 F.2d 578, 581 (11th Cir. 1989).  A motion for judgment as a matter of law should be granted only if "facts and inferences point overwhelmingly in favor of one party, such that reasonable people could not arrive at a contrary verdict . . . ."  Carter, 870 F.2d at 581.

Having concluded that Defendant is not entitled to qualified immunity for the arrest that occurred at the time Plaintiff was detained and handcuffed, and viewing the evidence presented at trial in the light most favorable to Plaintiff, the Court cannot conclude that "there is no legally sufficient evidentiary basis for a

reasonable jury to [have found]" for Plaintiff based upon the arrest at the time Plaintiff was detained and handcuffed.  See Chaney, 483 F.3d at 1227 (quoting Lipphardt, 267 F.3d at 1186).  Defendant's Motion for Judgment is required to be denied.

The trial evidence about Plaintiff's detention, however, does not conclude here.  This is a unique case where the Parties contend that an arrest occurred at two different times, separated by the span of only about an hour.  The facts at trial were undisputed that Defendant had more information and engaged in consultation with others, including other law enforcement officers, when Plaintiff was told he was being charged with child molestation and transported to the police station jail.  The trial was ordered to resolve the factual dispute regarding when the arrest occurred.  Having determined an arrest, without arguable probable cause, occurred when Plaintiff was handcuffed, the question remains whether Defendant's further investigation and consultation with other police officers developed arguable probable cause requiring a reevaluation of Plaintiff's detention after the additional information was developed and the consultations were completed.  Specifically, would the development of arguable probable cause when Defendant believed he arrested Plaintiff and had him transported to the police station jail, require

Defendant to be granted qualified immunity after that point.  It is against this backdrop that the Court now considers Defendant's Motion to Alter.

      D.    <u>Analysis: Motion to Alter or Amend the Judgment or, in the Alternative, for a New Trial</u>

Defendant argues that the Court should, under Rule 59 of the Federal Rules of Civil Procedure, alter the jury's verdict and enter judgment in favor of Defendant or, in the alternative, grant Defendant a new trial.  Defendant raises several grounds for the relief he seeks.

Defendant first argues that he is entitled to qualified immunity.  (Mot. to Alter at 18-21).  The Court, for the same reasons it denied Defendant's Motion for Judgment, necessarily must deny Defendant's Motion to Alter based on the arrest of Plaintiff when he was detained and handcuffed.  Defendant did not have qualified immunity for this arrest.  The issue is whether qualified immunity arose later.

After Defendant arrested Plaintiff, he engaged in further investigation of the incident reported to 911.  This investigation included the interview of Ms. Wood about what occurred at the Park.  (Trial. Tr. at 308:3-7).  Defendant also discussed with Sgt. Ormond and the two investigators at the scene, one from the sex crimes unit, facts Defendant had developed during his investigation.  (<u>Id.</u> at 306:21-307:14).  He sought from them their input on whether there was probable

cause to arrest.  (Id. at 306:21-307:14).  The officers also consulted at least one

attorney from the Fulton County District Attorney's Office Crimes Against

Women and Children Unit.  (Id. at 308:8-13).  The other officers at the scene, and

the attorney, all agreed that probable cause to arrest existed.  (Id.).  It was at this

time that Defendant believed he arrested Plaintiff because he believed his further

investigation established that there was probable cause to arrest.  (Id. at

308:16-18).  Based on these investigatory steps, the Court concludes that, at this

point, a reasonable police officer, knowing what Defendant knew at that time,

would have believed that probable cause to arrest existed.

The legal issue that remains, and which can now be considered, the time of

arrest having been determined, is whether the development of arguable probable

cause for the arrest allows Defendant to claim qualified immunity even though

there was an absence of arguable probable cause at the time the Court found, and

the jury implicitly found, the arrest occurred.[28]  That is, where arguable probable

cause becomes known to an arresting officer after the initial arrest is the arresting

officer entitled to qualified immunity for events occurring after arguable probable

cause is established.  If Defendant is allowed to claim that arguable probable cause

supports an arrest at a later point and Defendant is, at that time, entitled to qualified

---

[28]     The Court's research on this issue suggests, at least in this Circuit, that this
issue may be one of first impression.

immunity, this finding would limit Plaintiff's compensable damages for the violation of his Fourth Amendment right to only those he suffered from the time he was handcuffed, detained, and arrested, to when Defendant concluded his investigation and had arguable probable cause to continue to detain Plaintiff.

Defendant, in seeking a new trial, asserts that "the jury's questions presented during deliberations highlight (1) the jury's confusion about [their] role in this case and the relevant law; (2) no evidence exists of an intentional constitutional violation; and, (3) the jury's award was tainted by [their] consideration of attorney's fees as an element of damages." (Mot. to Alter at 25).

"Generally, a motion for a new trial may be granted where 'the verdict is against the weight of the evidence, . . . the damages are excessive, or . . . for other reasons, the trial was not fair to the moving party; and may raise questions of law arising out of alleged substantial errors in admission or rejection of evidence or instructions to the jury.'" Vig v. All Care Dental, P.C., No. 1:11-CV-4487-WSD, 2014 WL 129408, at *3 (N.D. Ga. Jan. 14, 2014) (quoting Duncan, 311 U.S. at 251).

Defendant argues that the jury was confused about their role and the relevant law. (Mot. to Alter at 26-27). Defendant argues that, based on the jury's questions, they were focused on the legality of Plaintiff's actions and not whether

Defendant intentionally violated Plaintiff's rights.  Defendant argues that the jury

reached their verdict based on their conclusion that Plaintiff was innocent of the

crimes charged.  (Id.).  Defendant argues further that, based on their question about

the meaning of the word "intentionally," the jury was confused about this standard

as well.  (Id. at 27).  Defendant asserts he is entitled to a new trial because of this

alleged jury confusion.  The Court also concludes that Defendant continues to

contend, even if inartfully, he is entitled to litigate whether Defendant is entitled to

qualified immunity when after his investigation and consultations, he decided he

had probable cause to arrest Plaintiff.

Although the Court may not agree with Defendant's basis for the claimed

jury confusion, the Court also accepts that the jury was confused about their role,

may well have reached an unjust result and may have awarded damages that are

not supported by the law.  The issue of the scope of damages allowed and the

evidence that should be admitted in support of damages arose at the eleventh hour

in this case, beginning with evidentiary issues raised on the morning of trial.  (See

Trial Tr. at 8:22-27:16).  The Court ultimately allowed significant evidence to be

introduced to permit Plaintiff to support his damages claimed to be the result of his

treatment after his arrest.  The Court was then, and is still now, unsure if this

evidence, in whole or in part, should have been admitted.  The Court sought to

address the claimed prejudicial effect on Defendant by giving appropriate limiting instructions, which the Court concludes may well have lead to jury confusion. This confusion, the Court concludes, warrants a new trial on damages.

As a prerequisite to a new trial, the Court must first consider whether Defendant is entitled to qualified immunity when arguable probable cause was developed after Defendant was arrested by being put in handcuffs.

If Defendant is entitled to qualified immunity from the point after which he completed his investigation, the scope of damages may well be limited to those Plaintiff alleges to have suffered based on his detention from the time he was handcuffed and detained, to the time he was transported to the police station jail. Even if Defendant is not entitled to qualified immunity after arguable probable cause is established, the Court concludes that the damages awarded by the jury in this case were excessive and a new trial on damages is warranted for this reason alone.[29]

The Court is allowed to grant a new trial where the trial was not fair to the moving party, when there are alleged errors in admission of evidence or instructions, or when damages are excessive.  <u>Duncan</u>, 311 U.S. at 251.  Here, the

---

[29]    Because the Court concluded that Defendant did not have arguable probable cause to arrest Plaintiff when he did, and because it concludes that a new trial on the issue of damages is required, it is not necessary to consider the other grounds upon which Defendant requests a new trial.

Court considers that a fundamental legal issue was not required to be addressed and in not doing so, Defendant was not treated fairly, evidence the Court admitted likely confused or misled the jury, and the verdict here was excessive.  For these reasons, the Court exercises its discretion to grant a new trial and to require the Parties to address whether Defendant may claim qualified immunity based on the arguable probable cause he developed after the arrest but upon which he relied in advising Plaintiff of the charges for which he was arrested and ordered to be transported to the police station jail.

## III.   CONCLUSION

For all of the foregoing reasons,

**IT IS HEREBY ORDERED** that Defendant Andres Facemyer's Motion for Judgment as a Matter of Law [61] is **DENIED**.

**IT IS FURTHER ORDERED** that Motion to Alter or Amend the Judgment or, in the Alternative, for a New Trial [62] is **GRANTED IN PART** and **DENIED IN PART**.  The Court will conduct a new trial on the issues of damages, subject to the Court's initial consideration of whether the development of arguable probable cause after the arrest and before Defendant advised Plaintiff of the charges for which he was arrested and was ordered to be transported to the police station jail,

entitles Defendant to claim qualified immunity for events occurring after that point.

**IT IS FURTHER ORDERED** that the Parties shall submit legal memoranda on the issue of whether the establishment of arguable probable cause after the arrest entitles Defendant to claim qualified immunity at that point. Because Defendant has the burden to establish qualified immunity, he shall file his memorandum on this issue on or before October 30, 2015.  Initial and further briefing of this issue, including the briefing schedule, shall be governed by the Court's Local Rules.

**IT IS FURTHER ORDERED** that Plaintiff Dan J. Benson's First Motion for Attorney's Fees [60] and Second Motion for Attorney's Fees [68] are **DENIED WITHOUT PREJUDICE**.  Plaintiff may, within thirty (30) days after the conclusion of litigation in this Court, refile his motion for attorneys' fees and costs.

**SO ORDERED** this 30th day of September, 2015.

_____
WILLIAM S. DUFFEY, JR.
UNITED STATES DISTRICT JUDGE